HEIDI CALIGIURI, Plaintiff-Appellee, v. FIRST COLONY LIFE INSURANCE COMPANY *et al.*, Defendants (Merrill Lynch Life Agency, Inc., Defendant-Appellant and Cross-Defendant and Appellant; William Maniscalco, Cross-Plaintiff and Appellee).

First District (6th Division) No. 1—00—1998

Opinion filed December 1, 2000.—Rehearing denied February 21, 2001.

Cantwell & Cantwell, of Chicago (Peter A. Cantwell and Stephen F. Boulton, of counsel), for appellant.

Deutsch, Levy & Engel, Chtrd., of Chicago (Stuart Berks and James E. O'Halloran, of counsel), for appellee Heidi Caligiuri.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Defendant Merrill Lynch Life Agency, Inc. (MLLA), an Illinois corporation, appeals an order of the circuit court of Cook County denying its motion to compel arbitration and stay the present action brought by plaintiff Heidi Caligiuri against MLLA and defendants First Colony Life Insurance Company (First Colony) and William A. Maniscalco. First Colony and Maniscalco are not parties to this interlocutory appeal.

The record on appeal discloses the following facts. MLLA is a

wholly owned subsidiary of Merrill Lynch, Pierce, Fenner & Smith, Inc. (MLPF&S), a broker-dealer registered under section 15 of the federal Securities Exchange Act of 1934 (see 15 U.S.C. § 78O (1998)) (Exchange Act), a member of the New York Stock Exchange, Inc. (NYSE), and the National Association of Securities Dealers, Inc. (NASD). In 1975, MLPF&S sought a "no action" letter from the Securities and Exchange Commission's Division of Market Regulation stating that it would not recommend action to the Securities and Exchange Commission (SEC) based on representations set forth in MLPF&S's request.

MLPF&S represented that it proposed to begin selling insurance products, some of which may be deemed securities under federal law. However, NYSE requirements prohibited the payment of insurance commissions to MLPF&S account executives. Moreover, according to MLPF&S, nearly all state insurance laws prohibited the payment of insurance commissions to entities not licensed as insurance agents. Furthermore, most state insurance laws did not permit a nondomestic corporation or a corporation not primarily engaged in insurance sales to be licensed as insurance agents.

MLPF&S proposed to form a series of wholly owned subsidiaries to sell insurance products. Each subsidiary would be licensed as an insurance agency under its state law. The office manager and account executives of each MLPF&S branch would become licensed in the appropriate state as individual insurance agents. Each MLPF&S branch would also host at least one insurance specialist employed by the appropriate subsidiary but subject to supervision by the MLPF&S office manager. The insurance specialists would only sell insurance but would not sell or be compensated for the sale of variable contracts (which might be securities under federal law).

In addition, to comply with NYSE requirements, MLPF&S represented that all insurance premiums would be sent by customers directly to their respective insurance companies or delivered to those companies by MLPF&S. The insurance companies would then pay commissions to the appropriate subsidiaries. The subsidiaries would not receive or accumulate customer funds. The subsidiaries and their personnel would all be deemed persons associated with a registered broker-dealer as defined by section 78c(a)(18) of the Exchange Act (see 15 U.S.C. § 78c(a)(18) (1994)). MLPF&S would maintain full responsibility for the training, supervision and control of the insurance specialists as it did for its registered representatives.

The Securities and Exchange Commission's Division of Market Regulation stated that it would not recommend any action be taken against the subsidiaries, based on the representations made by MLPF&S.

According to the affidavit of Richard Choma, vice president and treasurer of MLLA, MLLA was formed to provide MLPF&S customers and only those customers with opportunity to purchase life insurance and insurance planning. Neither MLPF&S nor MLLA issued life insurance policies or acted as an insurance company. Choma also stated that, generally, MLPF&S account executives were not directly compensated by MLLA for life insurance sales, but by payments from MLLA through MLPF&S.

Defendant Maniscalco was a MLPF&S senior financial consultant. According to Choma, Maniscalco was never an MLLA employee. When he was employed by MLPF&S, Maniscalco applied to register with various industry organizations, including the NASD. As part of the form U-4 application, Maniscalco agreed to abide by the rules of these organizations and specifically to arbitrate any claims arbitrable under their rules.

In 1995, plaintiff Heidi Caligiuri and Mark Caligiuri, plaintiff's husband, established retail brokerage accounts with MLPF&S; Maniscalco was their financial consultant. In September 1995, MLPF&S prepared a "Financial Foundation Report" for the Caligiuris that comprehensively reviewed their finances, investments, retirement and estate planning goals. The report suggested that the Caligiuris consider purchasing life insurance to provide additional assets in the event of Mark's untimely death. An internal memorandum attached to Maniscalco's copy of the report urged him to consider the life insurance suggestion and instructed Maniscalco to "contact your Estate planner Specialist for competitive rates."

On December 26, 1996, Mark Caligiuri signed the first part of an application for a First Colony 20-year term life insurance policy in the amount of $500,000. Maniscalco signed the first part of the application as the broker on February 24, 1997.

In February 1997, the Caligiuris also opened a joint cash management account (CMA) with MLPF&S. The CMA application form incorporated a CMA agreement that provided in part:

"I agree that all controversies which may arise between us, including but not limited to those involving any transaction or the construction, performance or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration."

On March 10, 1997, Mark completed the second part of the First Colony application, which included a medical history. The application noted that Mark had a splenectomy in 1975. Mark also noted that he had had hepatitis, bronchitis, kidney failure and other physical disorders.

In a deposition, Maniscalco testified that he forwarded the completed application to "our Northbrook office, which is where all insurance matters are handled." Plaintiff alleged that the medical history was delivered to First Colony through Maniscalco and MLLA. On March 27, 1997, First Colony issued the policy, listing plaintiff Heidi Caligiuri as the beneficiary. In April 1997, the policy was amended to a 10-year term at Mark's request.

Maniscalco collected premium checks from the Caligiuris. According to Maniscalco, these were later returned by First Colony because the checks were made payable to "Merrill Lynch." Maniscalco testified that this was his first knowledge that the checks should have been made payable to the insurance company.

On October 1, 1997, Mark passed away. Medical records show that Mark was admitted to Sherman Health systems on September 30, 1997. The medical record showed a past history of hospitalization during the winter with pneumococcal meningitis. The medical "impression" was one of "[o]verwhelming pneumococcal sepsis" and stated, "[u]nderlying cause is lack of spleen."

On March 5, 1998, First Colony rejected Heidi's claim for benefits. First Colony relied in part on a provision of the policy requiring Mark to notify First Colony of any changes to the statements and answers given in the application before accepting delivery of any policy. First Colony stated that its investigation had revealed that Mark was hospitalized from March 23-31, 1997, and that Mark was in a coma for part of this time. First Colony stated that this hospitalization was for numerous medical problems, with a discharge diagnosis of meningitis with pneumococcal sepsis, disseminated intravascualar coagulopathy, hypotension and shock, anuria, oral canidasis, segmental atelectasis and pneumonia, hyperglycemia, hypokalemia, hypomagnesemia and hypocalcemia. First Colony also asserted that on April 7, 1997, Mark was treated for symptoms associated with his prior hospitalization for hepatitis, and on April 8-9, 1997, Mark was hospitalized and a spinal tap performed. First Colony stated that it would not have issued a policy to Mark if it had known this information.

On May 20, 1998, Heidi filed a three-count complaint against First Colony in the circuit court of Cook County, seeking a declaratory judgment and alleging breach of contract and violation of the Illinois Insurance Code (215 ILCS 5/1 et seq. (West 1996)). In June 1998, the case was removed to the United States District Court for the Northern District of Illinois. In February 1999, Heidi amended her complaint to add count IV, which joined Maniscalco and MLLA as defendants, alleging mishandling of Mark's application, failure to inform First Colony of Mark's medical condition, and lulling the Caligiuris into believing

the policy was effective. Later that month, First Colony demanded that MLLA accept tender of the defense based on a general agency agreement between First Colony and MLLA; this agreement also included an arbitration clause.

On April 5, 1999, Maniscalco filed his answer to the first amended complaint. Maniscalco denied the claim of negligence. Maniscalco also included a cross-claim against MLLA for indemnification based on agency principles.

On May 10, 1999, MLLA filed a motion to compel arbitration and stay the proceedings. On November 4, 1999, the federal court remanded this matter back to the circuit court of Cook County on the ground that the addition of Maniscalco and MLLA destroyed diversity jurisdiction in the federal court. On May 18, 2000, following briefing and a hearing on the matter, the trial court denied MLLA's motion to compel arbitration and stay the action, explaining in a written opinion that the court concluded that MLLA could not demand arbitration under the CMA agreement because MLLA was not an agent of MLPF&S or a third-party beneficiary of the CMA agreement. MLLA then timely filed a notice of interlocutory appeal to this court.

I

Initially, this court must address the standard of review in this case. Citing *State Farm Mutual Automobile Insurance Co. v. George Hyman Construction Co.*, 306 Ill. App. 3d 874, 880, 715 N.E.2d 749, 754 (1999), MLLA claims the question of arbitrability is reviewed *de novo*. However, *George Hyman Construction Co.* involved the validity of a choice of law provision of a contract in light of an arbitration clause in that contract, not a determination regarding arbitrability.

The parties agree that we must apply federal law to questions concerning arbitrability because the customer agreement "involves commerce" and is therefore governed by the Federal Arbitration Act (FAA) (9 U.S.C. § 1 *et seq.* (1994)). The FAA creates a "body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 74 L. Ed. 2d 765, 785, 103 S. Ct. 927, 941 (1983).

Heidi notes that this court has previously stated that "the Federal Rules of Civil Procedure, which are expressly mentioned in section 4 of the [FAA], 'do not apply in such state-court proceedings.' " *Comdisco, Inc. v. Dun & Bradstreet Corp.*, 285 Ill. App. 3d 796, 801, 674 N.E.2d 902, 905 (1996), quoting *Southland Corp. v. Keating*, 465 U.S. 1, 16 n.10, 79 L. Ed. 2d 1, 15 n.10, 104 S. Ct. 852, 861 n.10 (1984). Thus, state procedural law remains applicable to the state court proceeding. *Comdisco, Inc.*, 285 Ill. App. 3d at 801, 674 N.E.2d at 905.

Heidi argues that because the standard of review is procedural, it is governed by state law, with the established standard of review being whether the trial court abused its discretion in granting or denying the motion. See, *e.g.*, *Yandell v. Church Mutual Insurance Co.*, 274 Ill. App. 3d 828, 830-31, 654 N.E.2d 1388, 1389 (1995). A trial court abuses its discretion when it issues a ruling that is arbitrary and clearly erroneous. See, *e.g.*, *In re Beatriz S.*, 267 Ill. App. 3d 496, 499-500, 641 N.E.2d 953, 955 (1994).

██ ■ The proper standard of review in this case is dictated by the nature of the issues the trial judge was required to decide; arbitrability was but one of those issues. Under either federal or Illinois law, the right to compel arbitration stems from an underlying contract and generally may not be invoked by a nonsignatory to the contract. See, *e.g.*, *Britton v. Co-op Banking Group*, 4 F.3d 742, 744 (9th Cir. 1993); *Board of Education of Meridian Community Unit School District 101 v. Meridian Education Ass'n*, 112 Ill. App. 3d 558, 562, 445 N.E.2d 864, 867 (1983). The federal courts agree that while there is a strong and liberal federal policy favoring arbitration agreements, such agreements must not be so broadly construed as to encompass claims and parties not intended by the parties to the agreement. See, *e.g.*, *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1993). However, federal courts have recognized contract-based theories under which a nonsignatory may be bound to the arbitration agreements of others, such as: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing or alter ego; and (5) estoppel. See, *e.g.*, *Thomson-CSF*, 64 F.3d at 776. It would seem to follow as a corollary that the same types of theories could afford a basis for a nonsignatory to invoke an arbitration agreement signed by others. Indeed, this court has suggested that this is the rule. See *Howells v. Hoffman*, 209 Ill. App. 3d 1004, 1007-09, 568 N.E.2d 934, 936-37 (1991) (addressing claim that broker could compel arbitration as third-party beneficiary, but also citing federal cases referring to agency and contract principles generally).

██ ■ In this case, MLLA argues it could compel arbitration under the CMA agreement as an agent of MLPF&S. Generally, under both federal and Illinois law, the existence and scope of an agency relationship are questions of fact. See, *e.g.*, *National Labor Relations Board v. Donkins Inn, Inc.*, 532 F.2d 138, 141 (9th Cir. 1976); *Barbour v. South Chicago Community Hospital*, 156 Ill. App. 3d 324, 329, 509 N.E.2d 558, 562 (1987). The federal standard of review of a denial of a motion to compel arbitration is generally *de novo* to the extent such determinations are based on the interpretation of the underlying contract. See, *e.g.*, *Grunstad v. Ritt*, 106 F.3d 201, 204 (7th Cir. 1997).

In contrast, this case involves predicate findings of fact on the issue of agency. Federal courts have generally held that even though a denial of a motion to compel arbitration based upon waiver can be reviewed *de novo*, the predicate findings of fact are ordinarily not reversed unless they are clearly erroneous. *Leadertex v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995); *Fraser v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 817 F.2d 250, 251 n.2 (4th Cir. 1987). Similarly, under either federal or Illinois law, the trial court's ruling on agency in this case will be subject to the more deferential standard traditionally applied to findings by a trier of fact.

## II

██ MLLA argues that the trial court erred in ruling that MLLA failed to show it was an agent of MLPF&S entitled to invoke the arbitration clause in the CMA agreement. MLLA is a wholly owned subsidiary of MLPF&S, but stock ownership alone in one corporation by another is common in a parent-subsidiary relationship and does not create the relation of principal and agent or alter ego between the two. See *Thomson-CSF*, 64 F.3d at 777; *Main Bank v. Baker*, 86 Ill. 2d 188, 204, 427 N.E.2d 94, 101 (1981). Nevertheless, a corporate subsidiary may act as the agent of its parent corporation if the elements of an agency are proved in the context of a given case. *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill. App. 3d 383, 390, 577 N.E.2d 1344, 1350 (1991). Agency is a consensual, fiduciary relationship between two legal entities created by law, where the principal has the right to control the activities of the agent, and the agent has the power to conduct legal transactions in the name of the principal. *Illinois State Toll Highway Authority v. DiBenedetto*, 275 Ill. App. 3d 400, 410, 655 N.E.2d 1085, 1091 (1995). MLLA argues that MLPF&S had the right to control the manner and method in which MLLA worked. MLLA points to MLPF&S's correspondence with the SEC's division of market regulation, particularly the understanding that MLPF&S would maintain full responsibility for the training, supervision and control of the insurance specialists as it did for its registered representatives. Heidi responds that MLPF&S cannot be deemed to control the method of MLLA's placement, procurement or binding of insurance polices because MLPF&S is not a licensed registered firm or insurance producer in Illinois. Heidi also suggests that MLPF&S could not legally become licensed and registered and that this was the reason MLLA was formed in the first instance.

██ At first glance, MLPF&S's claim of control would seem to violate our supreme court's suggestion that "[w]hat one may do by an agent, he may do by himself." *Petrazelli v. Propper*, 409 Ill. 365, 369,

99 N.E.2d 140, 142 (1951). However, Illinois law has long held that in various situations a person who may be barred from becoming licensed in a field may nevertheless employ others who are so licensed to perform work requiring a license for that person. See *People ex rel. State Board of Examiners of Architects v. Rodgers Co.*, 277 Ill. 151, 153-55, 115 N.E. 146, 147-48 (1917); *Horwitz v. Holabird & Root*, 312 Ill. App. 3d 192, 195-96, 726 N.E.2d 632, 635 (2000). Of course, in such situations, the principal's control is not absolute, as the agent's activities may be constrained by his or her professional duties or the law itself.

■ However, MLLA has not pointed to any evidence in the record to suggest that it had the ability to conduct legal transactions in the name of MLPF&S. Indeed, MLLA appears to have been created because MLPF&S was unable to conduct the type of business involved in this case. Moreover, the record suggests that MLPF&S customers purchasing life insurance were supposed to remit their premiums directly to the insurer. Maniscalco testified that the Caligiuris' premium checks were returned by First Colony because they had incorrectly made the checks payable to "Merrill Lynch." In sum, while there may be evidence in the record as to negotiations MLLA facilitated between Mark Caligiuri and First Colony, MLLA has not identified any transaction in which it bound MLPF&S or conducted business in the name of MLPF&S.

MLLA notes that the aforementioned correspondence suggested that MLLA would be considered to be "associated" with MLPF&S under federal law, a designation based on direct or indirect control. MLLA then notes that federal law provides that a person who directly or indirectly controls another may be jointly and severally liable for violations of federal securities law to the same extent as the controlled person. See 15 U.S.C. § 77o (1994). MLLA asserts that "[t]he element of control establishes both agency and the liability of [MLPF&S] for the actions of MLLA both under principles of *respondeat superior* and under [the Exchange Act]." However, while *respondeat superior* liability may result from an agency, it cannot be relied upon to bootstrap a claim of agency in the first instance. The statutory imposition of liability in other circumstances need not supplant common law liability, but certainly suggests that Congress was unsure that traditional agency-based liability would attach in all of the situations Congress contemplated.

MLLA relies heavily on *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1122 (3d Cir. 1993), which applied "agency logic" to hold that named defendants MLPF&S and Merrill Lynch Asset Management, Inc. (MLAM), both subsidiaries of Merrill Lynch &

Co., Inc. (which was a nonparty to the suit), would be bound by an arbitration clause in a cash management account for retirement plans agreement, despite the fact that MLAM was not a signatory thereto. In *Pritzker*, however, the plaintiffs alleged that MLAM knowingly participated in the alleged violations of federal pension law because it credited the purchase of allegedly inappropriate investments to the accounts at issue. *Pritzker*, 7 F.3d at 1112-13. The *Pritzker* court stated that it was "evident from the record that MLAM was obligated to perform certain services in connection with the Accounts" at issue to hold that MLAM would be bound by the agreement signed by MLPF&S. Moreover, the *Pritzger* court stated that MLAM "may be an alter-ego of MLPF&S." *Pritzker*, 7 F.3d at 1122.

This case is distinguishable from *Pritzger*, as arbitration was sought there by MLPF&S, which was a signatory to the CMA agreement. Unlike *Pritzger*, the trial court here did not conclude that it was "evident from the record" that MLLA was "obligated" to perform services in connection with the CMA. Maniscalco and MLLA may have assisted Mark Caligiuri in applying for life insurance at the suggestion of Maniscalco, a MLPF&S employee, and a report prepared by MLPF&S. On the other hand, the record shows that the insurance transactions supported by MLLA were designed to occur outside the normal business structure of MLPF&S. MLLA points to no evidence equivalent to the allegation made against MLAM in *Pritzger* that MLAM credited transactions to CMAs. Nor does MLLA suggest it is an alter ego of its parent corporation.

In sum, MLLA presented some evidence that it was controlled by MLPF&S, but that such control was limited by state insurance laws and stock exchange requirements. MLLA did not point to evidence in the record showing that it had the ability to conduct legal transactions in the name of MLPF&S. The trial court, as the trier of fact, found that MLLA failed to show it was an agent of MLPF&S in this context. Given the record on appeal, the trial court's ruling was not arbitrary or clearly erroneous.

### III

■ MLLA argues that the trial court erred by failing to broadly interpret the CMA agreement. The trial court, however, ruled that MLLA could not invoke the arbitration clause in the CMA agreement because MLLA was not an agent of MLPF&S that had standing to invoke the arbitration clause of the CMA agreement. As this determination was not arbitrary or clearly erroneous, there is no need for this court to address the scope of the arbitration clause.

### IV

■ MLLA argues that the trial court erred in denying its motion

to compel arbitration of Maniscalco's cross-claim for indemnification by MLLA. The trial court noted in its opinion that Maniscalco did not object to the arbitrability of his cross-claim. Yet the trial court did not grant the motion to compel as to the cross-claim. Heidi offers no argument in defense of the trial court's decision on this point, but this court may affirm for any reason appearing in the record, regardless of whether it was relied on by the trial court.

MLLA argues that Maniscalco's cross-claim is arbitrable under NASD Rules 10101 and 10201. MLLA claims it can demand arbitration under the NASD rules as an "associated person" of MLPF&S. MLLA cites In re Prudential Insurance Co. of America Sales Practice Litigation, 133 F.3d 225, 228-30 (3d Cir. 1998), which held that a parent insurance company could compel arbitration as against former sales agent plaintiffs based on the form U-4 applications they submitted, despite the fact that the parent was a nonsignatory to those applications, which only referred to a wholly owned subsidiary that apparently dealt in securities. The Third Circuit determined that while form U-4 was technically an agreement between the applicant and the NASD, it was also clearly intended to benefit third-party nonsignatories as part of a broader effort by self-regulatory organizations such as the NASD to regulate the securities industry. In re Prudential Insurance Co., 133 F.3d at 230.

In this case, it is the wholly owned subsidiary that is not listed on form U-4 and which sells insurance that seeks to invoke the NASD rules regarding arbitration, but this is a distinction without a difference, given the rationale of In re Prudential Insurance Co. Thus, MLLA had standing to seek arbitration as a third-party beneficiary of the form U-4 application submitted by Maniscalco.

The question remains as to whether Maniscalco's cross-claim is subject to arbitration under the NASD rules. MLLA relies primarily on NASD Rule 10101, which provides as follows:

"This Code of Arbitration Procedure is prescribed and adopted *** for the arbitration of any dispute, claim or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:

(f) between or among members;

(g) between or among members and associated persons;

(h) between or among members or associated persons and public customers, or others; and

(i) between or among members, registered clearing agencies

with which the Association has entered into an agreement to utilize the Association's arbitration facilities and procedures. And participants, pledges, or other persons using the facilities of a registered clearing agency, as these terms are defined under the rules of such a registered clearing agency."

MLLA also cites NASD Rule 10201(a), but this rule merely describes the circumstances under which a claim eligible for arbitration under "the Rule 10101 series" is required to be submitted for arbitration.

The issue raised by Rule 10101 is whether Maniscalco's cross-claim for indemnity "aris[es] out of" or is "in connection with the business of" MLPF&S, or "aris[es] out of the employment or termination of employment of associated person(s) with" MLPF&S. Given that such language is generally given a broad scope in the context of arbitration, this court concludes that Maniscalco's and MLLA's assistance in procuring life insurance for Mark Caligiuri was "in connection with" the financial planning services provided by MLPF&S. Thus, Maniscalco's cross-claim for indemnity, based on alleged negligence in providing that assistance, is eligible for arbitration under NASD Rule 10101. Accordingly, NASD Rule 10201(a)(3) requires submission to arbitration at the instance of MLLA, as it is not disputed that MLLA and Maniscalco are "associated persons." See *Essex Corp. v. Independent Financial Marketing Group, Inc.*, 994 F. Supp. 532, 535-36 (S.D.N.Y. 1998).

In sum, the trial court erred in denying the motion to compel arbitration as to Maniscalco's cross-claim.

### V

 Finally, MLLA contends that the trial court erred in refusing to stay the action pending resolution of the arbitration of the cross-claim. The issue in the cross-claim is whether MLLA must indemnify Maniscalco if he is held liable in this case. A cause of action for indemnity does not arise until the indemnitee either has had a judgment entered against him for damages or has made payments or suffered actual loss. *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 199, 538 N.E.2d 530, 539 (1989). Thus, Heidi argues that her litigation should not be stayed.

On the other hand, Illinois law provides:

"Any action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this Section or, if the issue is severable, the stay may be with respect thereto only. When the application is made in such action or proceeding, the order for arbitration shall include such stay." 710 ILCS 5/2(d) (West 1998).

As the trial court was required to compel arbitration of Maniscalco's

cross-claim, some sort of stay appears to be required by the plain language of the statute. However, in *Board of Managers of Courtyards at the Woodlands Condominium Ass'n v. IKO Chicago, Inc.*, 183 Ill. 2d 66, 75-76, 697 N.E.2d 727, 732 (1998), the supreme court approved an arrangement in which the arbitration of a third-party claim involving contingent liability would be postponed pending the outcome of the underlying litigation.

The question is whether Maniscalco's cross-claim is severable from the underlying litigation. Indemnity claims have been severed in the past. *E.g.*, *Patch v. Glover*, 248 Ill. App. 3d 562, 618 N.E.2d 583 (1993); *McGregor v. Ruan Leasing Co.*, 200 Ill. App. 3d 406, 558 N.E.2d 175 (1990). Given that a cause of action for indemnity generally does not arise until the indemnitee has had a judgment entered against him for damages, has made payments or suffered actual loss, on remand, the trial court shall include a stay with respect to the cross-claim for indemnity in the order compelling arbitration of the cross-claim.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded.

BUCKLEY and O'BRIEN, JJ., concur.