ALLA OZIK, as Special Adm'r of the Estate of Mikhail Ozik, Deceased, Plaintiff-Appellee, v. TIMOTHY GRAMINS *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 1—00—3280

Opinion filed October 27, 2003.

Barbara M. Meyer and Henry E. Mueller, both of Skokie, and Botti, Mari-

naccio & DeLongis, Ltd., of Oak Brook (Aldo E. Botti, Jean M. Lasics, and Thomas E. Haught, of counsel), for appellants.

Manchik & Romaker (Craig L. Manchik, of counsel), and Novoselsky Law Offices (David A. Novoselsky and Leslie J. Rosen, of counsel), both of Chicago, for appellee.

JUSTICE McBRIDE delivered the opinion of the court upon denial of rehearing:

Defendants police officer Timothy Gramins, police officer Ronald Glads, and the Village of Skokie (Village or Skokie) appeal from a judgment in favor of plaintiff Alla Ozik, as special administrator of the estate of Mikhail Ozik, deceased.

In a first amended complaint, Alla Ozik alleged that her 16-year-old son, Mikhail Ozik, was a passenger in a vehicle being operated by 19-year-old Alexander Goldberg on September 13, 1995, at 10:16 p.m., when the officers detained and issued traffic citations to Goldberg. She further alleged the officers knew or should have known that the underage Goldberg was intoxicated but allowed Goldberg to retake control of the vehicle at approximately 11:30 p.m. Further, while driving at 11:47 p.m., Goldberg lost control of the vehicle and struck a tree, causing slight injuries to himself and fatal injuries to Mikhail Ozik. Plaintiff sought damages from Goldberg, and the officers and Village, based on the Survival Act (755 ILCS 5/27—6 (West 1994)), the Wrongful Death Act (740 ILCS 180/1 (West 1994)), and the family expense act (see 750 ILCS 65/15 (West 1994)). Plaintiff subsequently dismissed Goldberg pursuant to settlement, for the limits of his $20,000 insurance policy, over the objection of the remaining defendants. Plaintiff filed a second amended complaint naming only the officers and Village as defendants, and her claims proceeded to trial. The jury returned a $1.8 million verdict in plaintiff's favor, reduced the verdict by 35% due to Mikhail Ozik's contributory negligence, and the trial court entered a judgment of $1.14 million against the officers and Village.

On appeal, the officers and Village do not dispute any of the facts adduced at trial and raise only arguments of law. The officers and Village contend the judgment is in error, because: (1) the officers were under no duty to Mikhail Ozik to take custody of Goldberg instead of issuing traffic citations, (2) even if the officers were under an actionable duty, they were immune from tort liability due to sections 4—102 and 4—107 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/4—102, 4—107 (West 1994)) (Tort Immunity Act or Act), and (3) if they were not immune from liability, they were entitled to apportion liability to the dismissed defendant

Goldberg, in order to benefit from section 2—1117 of the Code of Civil Procedure (735 ILCS 5/2—1117 (West 1994)), the several liability law.

We review the relevant facts. During the hearing on Alla Ozik's motion to dismiss Goldberg pursuant to the settlement, she indicated Goldberg had tendered the limits of his insurance coverage, was incarcerated, and had no assets. The record discloses that Goldberg was convicted of the reckless homicide of Mikhail Ozik and began serving a 10-year prison sentence in 1996. The police officers' attorney, who said she was also appearing that day on behalf of the Village, asked for time to file a written objection. Goldberg's attorney responded that the officers and Village lacked standing to object, because they had not filed a counterclaim against Goldberg seeking contribution. He also stated the settlement was in his client's best interests and entered into in good faith, and that unless there were facts showing collusion or fraud between the settling parties, there was no basis for objecting to Goldberg's dismissal. The trial judge allowed the officers' attorney to respond to the contribution and "good faith" arguments. The trial judge then indicated that a briefing schedule was unwarranted and dismissed Goldberg with prejudice.

As indicated above, Alla Ozik subsequently filed a second amended complaint. Defendants denied the material allegations and raised section 2—1117 (735 ILCS 5/2—1117 (West 1994)), the several liability law, as an affirmative defense. The trial judge granted Alla Ozik's motion to strike the affirmative defense. The trial judge also granted Alla Ozik's motion in limine to bar any apportionment of liability under section 2—1117 at the jury trial, and then denied defendants' motion to reconsider this ruling.

John Hudson testified he was a passenger in the backseat of Goldberg's car on the evening of September 13, 1995. He smelled alcohol on Goldberg's breath while Goldberg drove Hudson, Vlad Pikovskiy, and Mikhail Ozik to Evanston. During the drive, Goldberg drank from a 40-ounce bottle of malt liquor. In Evanston, Goldberg continued to drink from the bottle, and Hudson and Pikovskiy smoked marijuana near the car. Goldberg threw the empty bottle out the car's window during the return drive to Skokie and began to drive erratically. Goldberg changed from lane to lane at up to 80 miles per hour, and almost hit a car at Howard and McCormick. Goldberg's eyes were half-closed and bloodshot, and Goldberg was acting drunk. At 60 miles per hour, Goldberg rear-ended a car at McCormick and Dempster, and Hudson was thrown into the front seat. Hudson urged Goldberg to drive away, which Goldberg did by driving northbound in the southbound lanes, turning left against the red light at McCormick and Dempster, and speeding.

Goldberg pulled the car over at a McDonald's restaurant in response to a pursuing police car and got out of the car when directed by an officer. Goldberg used the door to pull himself from the seat and for support while Goldberg swayed and swerved. Goldberg lost his balance twice before the officers motioned him to the sidewalk, and he then swerved and swayed to the sidewalk. During the one-leg-stand test, Goldberg kept putting his foot down to regain balance. The test was repeated, and Goldberg again lost his balance and put his foot down.

The officers returned Goldberg to the car and had Goldberg drive back toward the accident scene, to a Clark station. Hudson fell asleep in the car for 60 to 90 minutes and woke up around 11:30, when the officers allowed Goldberg to drive away with Hudson, Ozik, and Pikovskiy as his passengers. At around 11:45, Goldberg dropped Hudson and Pikovskiy off at their neighboring homes. At around 12 midnight, Goldberg drove away, tires screeching.

Vlad Pikovskiy, the other backseat passenger, testified Goldberg's breath had a strong odor of alcohol during the drive to Evanston and that Goldberg's speech was slurred. On the way back to Skokie, Goldberg began driving 80 miles per hour, swerving into oncoming traffic, and almost hit some parked cars. Pikovskiy warned Goldberg he was going to rear-end a car, and Goldberg applied the brakes, putting his car into a skid. Goldberg's car struck the other car at 30 to 40 miles per hour, pushing it forward about one car's length and into the intersection. Pikovskiy told Goldberg that Goldberg was drunk and to leave the scene of the accident, which Goldberg did. When the police approached the car, Goldberg's window was down, and Pikovskiy heard the officers say the car smelled like weed and liquor. Goldberg almost fell down when he got out of the car at the McDonald's, stumbled and held onto the car door, then swayed to the sidewalk. During the one-leg-stand test, Goldberg put his foot down right away. When Goldberg followed the police officer to the Clark station, Goldberg was swerving the car within the lane. At the Clark station, he walked the same way he had walked at the McDonald's. When he drove away from the Clark station, Goldberg was swerving the car within the lane. Goldberg dropped Pikovskiy off at 11:50 or 11:55. Pikovskiy acknowledged that he was convicted of theft in 1997 and two residential burglaries in 1999.

Alexander Goldberg testified that he drank 80 to 120 ounces of beer and malt liquor on September 13, 1995, and had his last drink about an hour before rear-ending the car at McCormick and Dempster. The police officer that stopped Goldberg asked Goldberg if Goldberg was drunk and said he smelled weed in the car. Goldberg was sure the

officers were going to know he was drunk because the car stank of weed and he stank of alcohol. He never said he had taken Tylenol Cold & Flu. He was dizzy and noticeably swayed next to the car. He could not stand on one foot because he was drunk. One of the officers returned the car keys to Goldberg and told him to follow the officer to the Clark station. At the Clark station he was given a test with a flashlight shining in his eyes. He was given some tickets and overheard the officers talking about what a wild bunch of kids they were and that they had been drinking and smoking marijuana. The officers were laughing when they talked about Goldberg being drunk. Goldberg dropped off Hudson and Pikovskiy and was going to drop off Mikhail Ozik when he lost control of the car approximately seven minutes after being released by the officers.

Rickey Ussery testified that he and his wife were injured when their car was struck by a hit-and-run driver. Ussery drove to the nearby Clark station, where he called 911 and reported the other car's license plate. Approximately 45 minutes after the accident, at almost 11 p.m., two police cars escorted the other car to the Clark station. One officer, whom Ussery had seen do a U-turn and follow the other car, told Ussery that the other driver was drunk or high on drugs. When Ussery left the Clark station at about 11:15, the officers and other driver were still there.

Skokie police officer Ronald Glad, one of the officers who detained Goldberg at the McDonald's at 10:16 p.m., testified he began working as a police officer in 1990. He smelled cigarettes when he approached Goldberg's car. Goldberg denied being in an accident and denied drinking. Goldberg spoke with a Russian accent without slurring. He never heard Goldberg say he had taken Tylenol Cold & Flu. There was no evidence Goldberg had been drinking. An officer needs reasonable suspicion to conduct field sobriety tests, and his reason for testing Goldberg was to detect impairment from alcohol. He administered a one-leg-stand test, and Goldberg did fine. Officer Gramins did the same test and a horizontal gaze nystagmus (HGN). He asked Officer Wolfer to do an HGN, because Officer Wolfer had a penlight, and Goldberg passed the HGN administered by Officer Wolfer. Skokie police policy did not require that three types of tests be administered, and an officer could elect any of the field sobriety tests. He was conducting a DUI and zero tolerance investigation, but he remained three to four feet away and did not attempt to smell Goldberg's breath. This was not a violation of procedure. Goldberg's breath smelled like cigarettes, not alcohol.

It could take up to four hours to process a DUI. When Officer Gramins issued the five citations to Goldberg, Officer Glad was not

aware that Goldberg had driven the wrong direction on McCormick, turned left against a red light, and crossed a double line. Goldberg could have been cited for reckless driving. The criteria for reckless driving and leaving the scene of an accident are very similar, and they carry the same punishment because they are both Class A misdemeanors. Reckless driving requires a custodial arrest; however, leaving the scene of an accident does not.

Goldberg left around 11:10 p.m. or 11:15 p.m. and did not drive unusually. Officer Glad spoke with Officer Gramins for a few minutes and then returned to the station. He arrived at the station at 11:20 p.m. or 11:25 p.m. and had no paperwork to complete.

Skokie police officer Timothy Gramins testified he was the officer who made the U-turn and followed Goldberg after the first collision. He was hired by Skokie in 1995 and took training at the Chicago Police Academy. He was not required to administer any specific number of the standardized field sobriety tests and could administer the ones he felt were appropriate.

Goldberg was smoking and he told Goldberg to put out the cigarette. Goldberg's breath did not smell of alcohol. Goldberg denied drinking and said he had taken Tylenol Cold & Flu for a cold. Officer Gramins had no idea how much or when Goldberg took the Tylenol Cold & Flu, but he conducted an HGN test and one-leg-stand test to detect if Goldberg was impaired by the medication. Goldberg spoke with a Russian accent, without slurring. Goldberg did really well on the tests and was not impaired.

Under the zero-tolerance law, someone under 21 years could not consume alcohol and drive. If he stopped an under-21 driver for speeding, for example, and detected the driver had consumed one drop of alcohol, he could not allow him to continue driving. It was his duty to take the driver to the station for a Breathalyzer test or to the hospital for a blood or urine test. After the test, the person could not drive home and would be turned over to a "reasonable sober" party to be taken home.

He cited Goldberg for failing to reduce speed to avoid an accident, leaving the scene of a property damage accident, speeding, driving left of center, and having one headlight. He did not cite Goldberg for driving northbound in the southbound lanes of McCormick after striking Ussery's vehicle, turning left against a red light after striking Ussery's vehicle, leaving the scene of a personal injury accident, or reckless driving, in his discretion. He denied that his reason for not writing additional or different citations was that he would have had to complete more paperwork or make a custodial arrest of Goldberg at the end of his work shift. He was scheduled to work until 11:15 p.m., but would

be paid overtime if he worked longer. Goldberg left the Clark station at 11:15 p.m., and Officer Gramins arrived back at the station at approximately 11:30 p.m..

Skokie police detective Richard Wolfer testified that he began working for Skokie in 1989 and was a patrol officer on September 13, 1995. When he arrived at the McDonald's, all of the car's occupants were standing on the sidewalk, and he never saw any of them walk. When he searched the car it smelled of smoke. He administered an HGN test to Goldberg because Officer Glad asked him to and he did not know why Officer Glad made this request. He administered the test by holding a penlight 8 to 10 inches away from Goldberg's face. He held the penlight at maximum deviation for approximately one second. When asked if he was required to hold the penlight at maximum deviation for four seconds in order to properly administer an HGN test, Officer Wolfer testified he had "never heard of how many seconds" he was supposed to hold the light at maximum deviation. Goldberg followed the instructions about the test and passed the test. Goldberg's eyes were not watery, and his breath smelled of cigarettes, not alcohol, when he was 12 to 18 inches away. Goldberg did not stumble and stood without swaying or falling. Field sobriety tests cannot be administered arbitrarily, and an officer must first have a suspicion. Under certain circumstances, it could take all four of the field sobriety tests to determine if someone was impaired. Officer Wolfer was called away to the scene of an arson and left before anyone else did.

Skokie police sergeant Frederick W. Brehmer testified he worked as an evidence technician at the fatal accident scene. Goldberg's vehicle crossed from one side of Dempster to the other, across all four traffic lanes and a center turn lane, struck a tree, and broke in half. The front half of the vehicle continued to travel an additional 46 feet, and the trunk lid flew onto the roof of an adjacent building.

Skokie police officer Vincent Pszczolkowski, who became a police officer in 1981, testified he was dispatched to the fatal accident scene, where he found Goldberg lying on his side on the pavement and checked Goldberg for injuries. He was not checking for impairment, and he did not detect an odor of alcohol. Mikhail Ozik was buckled in the passenger's seat, with his body facing backward. Mikhail Ozik's chest was moving when he approached. There was no pulse at the wrist and he covered Mikhail Ozik with a blanket. He cited Goldberg for doing 80 miles per hour in a 35-mile-per-hour zone. Goldberg was taken to the hospital, and Pszczolkowski continued his investigation there at 2 a.m. Goldberg had glassy eyes, slurred speech, smelled slightly of alcohol, and said he had been drinking, and so he cited Goldberg for DUI.

Craig Nordin, a Skokie paramedic, testified that when he arrived at the fatal accident scene, Goldberg was lying in the street being treated by another team of paramedics. He helped put Goldberg on a backboard. His head was at Goldberg's midsection for about 30 seconds, about 18 to 20 inches from Goldberg's face, and he did not detect alcohol on Goldberg's breath.

Emergency room nurse Gail Crabbe, R.N., testified that Goldberg had a strong smell of alcohol coming from his breath and pores when he was brought to the emergency room, which she noted in his hospital chart.

Daniel J. Brown, Ph.D., a forensic toxicologist and former chief of the Illinois crime lab, testified that Goldberg had a blood-alcohol concentration (BAC) of .204 and was grossly intoxicated at 10:16 p.m. on September 13, 1995. A person with more than .2 BAC could not mask the signs of intoxication, and Goldberg's intoxication would have been noticeable to a casual observer. Goldberg was impaired when he drove back to the Clark station, but when a highly intoxicated person is fearful, he has a tendency to focus greatly in order to get through a situation, and Goldberg's deposition indicated he was afraid of being arrested. Someone within three to four feet would have smelled the alcohol being excreted from Goldberg's skin and on his breath, and Goldberg could not have masked the smell with cigarettes. Persons under the influence of alcohol experience an uncontrollable jerking motion of the eyes known as horizontal gaze nystagmus (HGN), which can be measured. Goldberg would have exhibited HGN. A person giving an HGN test is supposed to hold a pen between 12 and 18 inches in front of the subject's nose.

Marcelline Burns, Ph.D., a research psychologist with 30 years' experience researching the effects of alcohol consumption and other drugs on humans, testified that Goldberg's BAC was .204 at 10:16 p.m. The blood draws showing Goldberg's BAC were solid scientific data, and the data was consistent with statements given by Goldberg, Pikovskiy, and Hudson, and with what Ussery stated Officer Gramins said to Ussery. The blood draws were not consistent with statements given by Officers Glad and Gramins.

Dr. Burns further testified that a BAC of .204 is very high and severely impairing. Goldberg's brain processing would have been slowed, his judgment and abilities to balance and walk would have been impaired, and he would have exhibited HGN. There is no scientific evidence that Tylenol Cold & Flu causes HGN. A distinctive odor of alcohol on Goldberg's breath would have been obvious to people anywhere near him.

Dr. Burns also indicated that she standardized field sobriety tests

for the National Highway Traffic Safety Administration (NHTSA), a division of the United States Department of Transportation. These standardized tests are taught to police officers in all 50 states and consist of the one-leg-stand, the walk and turn, and the HGN. Under NHTSA guidelines, an officer has no discretion to use less than all three tests on a suspected drunk and must continue with the testing even if one or two tests are passed. NHTSA issues guidelines and does not require municipalities to adhere to them. The deposition of Skokie police officer Van and a form that Skokie officers used in scoring field sobriety tests indicated that Skokie officers were required to conduct all three of the standardized tests on September 13, 1995. Officers Glad, Gramins and Wolfer used less than all three tests, and Gramins and Wolfer gave the HGN test incorrectly, holding the penlight the wrong distance from Goldberg's nose. Dr. Burns concluded that Goldberg did not pass the tests.

Skokie police sergeant Frederick W. Brehmer testified that he needed reasonable suspicion that someone had been drinking in order to conduct field sobriety tests, which is a lower standard than the probable cause required to make an arrest. He would need an odor, indications of impairment such as slurred speech, red glassy eyes, or fumbling with a license, or physical evidence such as a can or bottle to have reasonable suspicion of DUI. Once he established reasonable belief, he would proceed with field sobriety tests, and if the driver failed the tests, the officer would have probable cause. On cross-examination, he acknowledged that section 5 of the Skokie police department's General Order F—47 indicates an officer must have probable cause to support a suspicion of impairment in order to ask a driver to exit the vehicle for further examination. He stated that the document was in error, because if he had probable cause before the driver exited the vehicle, the officer would arrest the person right up front.

Retired Chicago police officer Jack Jucewicz testified he left the police force in 2000, after about 25 years in traffic enforcement and crash investigation, and about 6 years teaching anything traffic related at the Chicago Police Academy. He taught officers they must have probable cause to believe a driver has been drinking before field sobriety tests can be conducted. Officers Gramins and Glad had probable cause to believe Goldberg had been drinking when they stopped him after the first accident. Officers Gramins, Glad and Wolfer were not credible when they made statements about Goldberg's condition.

Further, once Officers Gramins and Glad had sufficient probable cause to conduct the field sobriety tests on Goldberg, they had no discretion whether to enforce the zero-tolerance law, even if they

believed Goldberg passed the tests. Proper procedure required the officers to take Goldberg to the station and process him for violating the zero-tolerance law. Officers Gramins and Glad should have also cited Goldberg for reckless driving and had no discretion as to whether to issue this citation. They violated proper police procedure when they did not cite Goldberg for reckless driving and take him into custody. The officers had probable cause to arrest Goldberg for DUI, and they violated proper police procedure by not citing Goldberg for DUI.

Additionally, under either the zero tolerance or DUI laws, an investigating officer is under a duty to smell the breath of the driver. Officer Glad violated proper police procedure when he did not attempt to smell Goldberg's breath.

Thamrong Chira, M.D., a Cook County deputy medical examiner who conducted Mikhail Ozik's autopsy, testified that death was caused by lacerations and abrasions throughout his body, an open fracture of his right femur, and a dislocated cervical spine.

After the jury returned the verdict described earlier in this order, the officers and Village filed a posttrial motion for judgment notwithstanding the verdict or alternatively a new trial pursuant to section 2—1202 of the Code of Civil Procedure (735 ILCS 5/2—1202 (West 1994)). Defendants raised numerous arguments, including the arguments they now make on appeal. The motion was denied and this appeal taken.

Defendants' first contention is that under the common law public duty rule, the officers owed no duty to Mikhail Ozik individually to execute and enforce the law and, therefore, could not have violated a nonexistent duty in a willful and wanton manner. Defendants further contend that Illinois does not recognize an action for willful and wanton conduct. Defendants conclude that in the absence of an actionable duty, the judgment is in error.

Defendants' second contention is closely related. Defendants argue that while plaintiff sought recovery under the willful and wanton exception of section 2—202 of the Tort Immunity Act (745 ILCS 10/ 2—202 (West 1994)), defendants are immunized by the more specific language of sections 4—102 and 4—107 of the Act, which do not make exception for willful and wanton conduct.

Plaintiff responds that willful and wanton conduct is an established exception to the public duty rule and to the immunities granted to municipalities and their employees by the Tort Immunity Act. In her second amended complaint, plaintiff alleged the officers were under a duty to execute and enforce the law in a manner free of willful and wanton conduct or reckless indifference to the safety of others. Further, notwithstanding this duty, the officers cited Goldberg and

then permitted and affirmatively directed Goldberg to drive although they knew Goldberg was under the influence of alcohol, was intoxicated and was impaired.[1] Plaintiff also alleged the officers permitted Goldberg, a minor, to operate a motor vehicle despite the existence of the zero tolerance law.[2]

■ According to the public duty rule, a municipality and its police officers owe a common law duty to preserve the community's well-being, and this duty is owed to the public at large rather than to specific members of the community. *Porter v. City of Urbana*, 88 Ill. App. 3d 443, 445, 410 N.E.2d 610 (1980). Accordingly, an individual may not recover for negligence. *Doe v. Calumet City*, 161 Ill. 2d 374, 385, 641 N.E.2d 498 (1994).

■ The protection of the common law public duty rule was codified in the Tort Immunity Act. *Doe*, 161 Ill. 2d at 385. Sections 4—102 and 4—107 of the Act provide:

"Neither a local public entity nor a public employee is liable for failure *** to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." 745 ILCS 10/4—102 (West 1994).

"Neither a local public entity nor a public employee is liable for an injury caused by the failure to make an arrest or by releasing a person in custody." 745 ILCS 10/4—107 (West 1994).

In addition, section 2—202 of the Act provides:

"A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2—202 (West 1994).

■ Willful and wanton conduct is defined by the Act as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1—210 (West 1994).

■ In *Doe*, the supreme court construed an exception to the public

---

[1]The DUI or driving while under the influence of alcohol or other drugs provision of the Illinois Vehicle Code (625 ILCS 5/11—501 (West 1994)) prohibits a person from driving or being in actual physical control of any vehicle while under the influence of alcohol, other drug(s), or intoxicating compound(s).

[2]The zero-tolerance provisions of the Illinois Vehicle Code (625 ILCS 5/11—501.8 (West 1994)) provide for the summary suspension of the driving privileges of a driver under the age of 21 years who has a blood-alcohol concentration of more than .00 but less than .10.

duty rule known as the special duty doctrine, in light of allegations that a police officer engaged in willful and wanton conduct in responding to a 911 call. *Doe*, 161 Ill. 2d at 388-91.

In *Doe*, it was alleged that an apartment resident informed responding police officers that a violent intruder had locked himself inside her apartment with her two minor children. *Doe*, 161 Ill. 2d at 381-82. The officer in charge of the scene declined to break down the door because he did not want to be liable for property damage, and the officers prevented the woman and her neighbors from breaking down the door. *Doe*, 161 Ill. 2d at 382. The officers spent 30 minutes calling the landlord to obtain a key, checking the front door, knocking on the door and windows, and purportedly looking for an unlocked window or rear door. *Doe*, 161 Ill. 2d at 382-83. A police investigator arrived at the scene and found that the back door was unlocked. *Doe*, 161 Ill. 2d at 383. From the time the officers arrived at the scene in response to the 911 call until the investigator interceded, the intruder had repeatedly raped one of the children and choked and threatened the other child. *Doe*, 161 Ill. 2d at 383.

The mother filed a complaint against the officers and municipality, which the trial court dismissed because it was under the mistaken impression that a plaintiff needed to plead and prove the special duty exception to the public duty rule in addition to willful and wanton conduct. The supreme court determined that this interpretation of the public duty rule was in error and that the plaintiff could recover by proving the police officers and municipality engaged in willful and wanton conduct alone. *Doe*, 161 Ill. 2d at 390.

The supreme court pointed out that the issue had already been settled by its recent decision in *Leone v. City of Chicago*, 156 Ill. 2d 33, 619 N.E.2d 119 (1993), where it held that the judicially created special duty exception and the statutorily created willful and wanton exception to the public duty rule are separate and distinct exceptions to municipal and officer liability. *Doe*, 156 Ill. 2d at 389. Accordingly, it was not necessary for plaintiff Doe to prove the special duty exception in addition to the willful and wanton exception. *Doe*, 161 Ill. 2d at 390.

Plaintiff Doe's case was remanded in part for a jury to determine whether the alleged conduct was in fact willful and wanton. *Doe*, 161 Ill. 2d at 405-06.

Subsequently, in *Fatigato*, it was alleged that police officers acted in a willful and wanton manner when they told a highly intoxicated man to leave his home after a domestic dispute and permitted him to drive his car while highly intoxicated. *Fatigato v. Village of Olympia Fields*, 281 Ill. App. 3d 347, 352, 666 N.E.2d 732 (1996). Shortly after the man drove away from the officers, his car crossed an interstate

median and struck an oncoming vehicle. *Fatigato*, 281 Ill. App. 3d at 352. The man was killed, and the occupants of the oncoming car were seriously injured. *Fatigato*, 281 Ill. App. 3d at 352.

The trial judge entered summary judgment against the plaintiff occupants of the oncoming car and in favor of the defendant officers. *Fatigato*, 281 Ill. App. 3d at 353. On appeal, the plaintiffs argued that *Doe*, 161 Ill. 2d 374, warranted reversal of the summary judgment order. *Fatigato*, 281 Ill. App. 3d at 353. The officers responded that summary judgment was proper because they did not owe the plaintiffs, who were members of the general public, a duty to protect them from an allegedly intoxicated motorist. *Fatigato*, 281 Ill. App. 3d at 353. The officers further argued that the willful and wanton exception of section 2—202 of the Act was negated by sections 4—102 and 4—107 of the Act. *Fatigato*, 281 Ill. App. 3d at 353. In short, the officers in *Fatigato* made the same arguments that the officers and Village make in the instant appeal.

However, the court agreed with the plaintiffs' contention that *Doe* dispelled the officers' public duty rule argument and that the officers could be held liable for injuries proximately caused by their willful and wanton conduct in the enforcement and execution of the law. *Fatigato*, 281 Ill. App. 3d 356-57.

The court noted that section 2—202 of the Tort Immunity Act applied to the facts because "in responding to the domestic dispute at the [man's] residence, [the officers] were clearly involved 'in the execution or enforcement of *** [the] law.' " *Fatigato*, 281 Ill. App. 3d at 356, quoting Ill. Rev. Stat. 1989, ch. 85, par. 2—202.

The court then rejected the officers' argument that sections 4—102 and 4—107 prevail over section 2—202 and provided the officers with immunity from allegations of willful and wanton conduct—it noted that *Doe* had specifically decided not to adopt this construction of the statutory sections. *Fatigato*, 281 Ill. App. 3d at 356.

The plaintiffs' two-count action alleging only willful and wanton conduct was remanded for a jury to determine whether the officers' conduct was in fact willful and wanton. *Fatigato*, 281 Ill. App. 3d at 358.

Based on *Doe* and *Fatigato*, we agree with plaintiff Alla Ozik that willful and wanton conduct in the execution and enforcement of the law is an established exception to the public duty rule and the immunities granted by the Tort Immunity Act.

Furthermore, *Doe* abrogated cases that defendants now rely upon for the proposition that police officers are not liable for willful or wanton conduct. See, *e.g.*, *Porter v. City of Urbana*, 88 Ill. App. 3d 443, 410 N.E.2d 610 (1980) (allegations insufficient to invoke special duty

exception to public duty rule); *Schaffrath v. Village of Buffalo Grove*, 160 Ill. App. 3d 999, 513 N.E.2d 1026 (1987) (same); *Fessler v. R.E.J., Inc.*, 161 Ill. App. 3d 290, 514 N.E.2d 515 (1987) (same); *Seibring v. Parcell's Inc.*, 159 Ill. App. 3d 676, 680, 512 N.E.2d 394 (1987) (same).

*Doe* also abrogated cases that defendants rely upon for the proposition that sections 4—102 and 4—107 of the Tort Immunity Act provide a blanket immunity that prevails over the willful and wanton exception stated in section 2—202 of the Act. *Doe*, 161 Ill. 2d at 389-90; 745 ILCS 10/2—202, 4—102, 4—107 (West 1994). See *Luber v. City of Highland*, 151 Ill. App. 3d 758, 502 N.E.2d (1986); *Jamison v. City of Chicago*, 48 Ill. App. 3d 567, 363 N.E.2d 87 (1977).

Additionally, defendants' reliance on *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 697 N.E.2d 699 (1998), is misplaced. *Zimmerman* determined that the special duty doctrine, a judicially created exception to the judicially created public duty rule, cannot override the immunities the legislature granted when it adopted the Tort Immunity Act. *Zimmerman*, 183 Ill. 2d at 46. Alla Ozik never relied upon the special duty doctrine; therefore, *Zimmerman*'s analysis of the interplay between the special duty doctrine and the Tort Immunity Act has no bearing here.

■ We also reject defendants' contention that Illinois does not recognize claims alleging willful and wanton conduct. *Doe* indicated there was some apparent "confusion [in the lower courts] concerning whether willful and wanton conduct constitutes a separate cause of action," and then, as discussed above, answered this question in the affirmative. *Doe*, 161 Ill. 2d at 388-91. Additionally, *Fatigato*, 281 Ill. App. 3d at 358, remanded the plaintiffs' two-count action alleging only willful and wanton conduct, demonstrating that Illinois does recognize independent claims of willful and wanton conduct.

Defendants' reliance on *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 641 N.E.2d 402 (1994), for the proposition that Illinois does not recognize this type of claim is misplaced. *Ziarko*, which preceded *Doe* by a few months, determined that the Joint Tortfeasor Contribution Act (740 ILCS 100/0.01 *et seq.* (1992)) permits a defendant found guilty of willful and wanton conduct to seek contribution from a defendant found guilty of ordinary negligence, provided that the willful and wanton acts were not intentionally tortious. *Ziarko*, 161 Ill. 2d 267, 641 N.E.2d 402. *Ziarko*'s analysis focused on the distinctions between negligence, willful and wantonness, and intentionally tortious behavior. *Ziarko*, 161 Ill. 2d at 274. The court remarked, "[t]here is no separate and independent tort of 'willful and wanton' misconduct" (*Ziarko*, 161 Ill. 2d at 274), before discussing what constitutes willful and wanton conduct. Nothing in *Ziarko*'s discussion or holding

indicates that police officers cannot be held liable for injuries resulting from willful and wanton conduct in the execution and enforcement of the law.

In a petition for rehearing, defendants argue that "*Doe* is now bad law having been overruled by subsequent Supreme Court decisions \*\*\* holding \*\*\* the courts [should not] read exceptions into the Tort Immunity Act where such exceptions are not contained therein." Defendants seem to have lost sight of the fact that an exception to the immunities provided to police officers by the Act is plainly stated in section 2—202 of the Act: "A public employee is not liable for his act or omission in the execution or enforcement of any law *unless such act or omission constitutes wilful and wanton conduct.*" (Emphasis added.) 745 ILCS 10/2—202 (West 1994).

Furthermore, recent cases which defendants now contend "invalidat[e]" *Doe*'s analysis of section 2—202 and "revers[e]" *Doe*'s holding do not focus on section 2—202 or address the conduct of police officers. In *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 692 N.E.2d 1177 (1998), the supreme court analyzed whether a fire marshal who bore sole final responsibility for determining where, when, and how to hold fire drills in Chicago held the type of position and engaged in the type of conduct immunized by section 2—201 of the Act. See 745 ILCS 10/2—201 (West 1994). In *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 680 N.E.2d 265 (1997), the supreme court analyzed whether Chicago's approval and supervision of a contractor's work in underground tunnels which led to flooding in downtown buildings was the type of conduct immunized by section 2—201 of the Act. See 745 ILCS 10/2—201 (West 1994). In *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 752 N.E.2d 1090 (2001), the supreme court analyzed whether the language of sections 2—103, 2—104, 2—106, 2—109, 2—201, or 2—205 of the Act included an implicit exception to the Act's immunities, as was argued by a real estate developer who wished to pursue a village for its alleged "corrupt and malicious motives" in denying a rezoning petition in order to benefit municipal cronies. See 745 ILCS 10/2—103, 2—104, 2—106, 2—109, 2—201, 2—205 (West 1998).

■ The cited cases were premised upon the well-established principle that when " 'an enactment is clear and unambiguous a court is not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express.' " *Village of Bloomingdale*, 196 Ill. 2d at 493, quoting *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189, 561 N.E.2d 656 (1990). In fact, in the most recent of the three cited cases, the supreme court referred to section 2—202 as an example of when the legislature has made an express exception to the immunities provided by the Act:

"If the legislature had intended to include an exception for 'corrupt or malicious motives,' it would have done so. Indeed, it has recognized exceptions elsewhere. In section 2—202, for example, the legislature granted immunity to a public employee for an 'act or omission in the execution or enforcement of any law *unless* such act or omission constitutes *willful and wanton conduct.*' (Emphases added.) 745 ILCS 10/2—202 (West 1998). In section 3—106, the legislature again recognized an exception to liability for willful and wanton misconduct. 745 ILCS 10/3—106 (West 1998). The legislature has recognized exceptions to its grants of immunity and enumerated these exceptions in the plain language of the Act." *Village of Bloomingdale,* 196 Ill. 2d at 494.

The supreme court then declined to read an implicit exception into the Act. *Village of Bloomingdale,* 196 Ill. 2d at 494-95.

■ Thus, contrary to defendants' petition for rehearing, the supreme court's recent opinions do not render *Doe* an "overruled nullit[y]." Because the plain language of section 2—202 indicates that it immunizes acts or omissions in the execution or enforcement of the law unless those acts or omissions constitute willful or wanton conduct, we conclude that defendants' interpretation of section 2—202 and post-*Doe* case law is fundamentally flawed. If we were to ignore the plain language of section 2—202, we would violate the precept that a court " ' "may not legislate, rewrite or extend legislation." ' " *Village of Bloomingdale,* 196 Ill. 2d at 494, quoting *Michigan Avenue National Bank v. County of Cook,* 191 Ill. 2d 493, 522, 732 N.E.2d 528 (2000), quoting *People v. Garner,* 147 Ill. 2d 467, 475-76 (1992).

Defendants' third and final contention is that they were entitled to have the jury apportion fault to the dismissed defendant, Goldberg, pursuant to the several liability law, section 2—1117 (735 ILCS 5/2—1117 (West 1994)). Defendants contend that if fault is apportioned to driver Goldberg and his passenger Mikhail Ozik, then the officers and Village would be apportioned less than 25% of the total fault and section 2—1117 would render them only severally liable and not jointly liable for the $1.14 million damage award. See 735 ILCS 5/2—1117 (West 1994).

Alla Ozik responds that defendants waived the issue of apportionment of fault by failing to object to her proposed jury instruction and by failing to tender a jury instruction which included Goldberg.

Defendants reply that they submitted an appropriate verdict form during the jury instruction conference, but the form was mistakenly omitted from the record on appeal. Defendants' reply brief includes argument about the alternate form. Additionally, defendants moved to supplement the record with the purported alternate form. We denied

the motion, because the form was not certified by the circuit court. Alla Ozik then moved to strike defendants' reply brief, and we took this motion with the case.

Defendants returned to the trial judge for certification, but the trial judge concluded that the alternate form was not previously offered during the instruction conference. Defendants cited a portion of the instruction conference transcript in which the court and counsel referred to some of the proposed instructions only by number, and contended that the discussion referenced two different instructions and verdict forms which defendants marked with the same number. Defendants also contended that one of the rejected instructions specifically included Goldberg. After considering the parties' arguments, including affidavits from the attorneys who attended the instruction conference, the trial judge determined that an instruction which specifically included Goldberg had not been previously tendered. The trial judge indicated he would not have allowed the parties to submit three different instructions (one from plaintiff and two from defendants) with the same number. The judge also indicated that copies of defendants' alternate instructions or verdict form should have been attached to the posttrial motion defendants had filed nearly 18 months earlier.

The judge remarked that even if "the Court feels that a verdict form should be in a certain form and the party doesn't agree with it[,] *** [if] it's an issue they wish to preserve for review, it's incumbent upon [the party] to get a ruling on their instruction. And I was never asked for a ruling on [the] specific verdict form [now] being submitted [for certification]."

Nevertheless, defendants did not withdraw their appellate reply brief or advise this court of the trial judge's ruling. Alla Ozik then moved this court to reconsider our order taking with the case her motion to strike the reply brief and to sanction defendants for tendering a false document and disparaging Alla Ozik's counsel.

In response to Alla Ozik's motion to reconsider and sanction, defendants continued to maintain they submitted an alternate form during the instruction conference, but they argued it nevertheless would have been futile for them to ask for a ruling on the specific form because the judge refused some of the parties' other proposed instructions and dictated how the verdict forms would read. Furthermore, the trial judge had previously rejected defendants' section 2—1117 theory, when he struck defendants' section 2—1117 affirmative defense, granted Alla Ozik's motion *in limine* regarding section 2—1117, and denied defendants' motion to reconsider the motion *in limine*.

Accordingly, we now grant the portion of Alla Ozik's motion seeking reconsideration of our order taking with the case the motion to strike the reply brief.

■ We also conclude that defendants have waived any argument concerning apportionment of fault pursuant to section 2—1117. Generally, a trial court has discretion to determine the appropriate jury instructions, and its determination will be reversed only for an abuse of discretion. *In re Timothy H.*, 301 Ill. App. 3d 1008, 1015, 704 N.E.2d 943 (1998). However, a litigant waives the right to object later, on appeal, to instructions or verdict forms that were given to a jury, when the party fails to make a specific objection during the jury instruction conference or when the form is read to the jury. See *Auton v. Logan Landfill, Inc.*, 105 Ill. 2d 537, 550, 475 N.E.2d 817 (1984); *Marek v. Stepkowski*, 241 Ill. App. 3d 862, 870, 608 N.E.2d 285 (1992). Additionally, even if the litigant properly objects to an instruction or verdict form, the litigant is still required to submit a remedial instruction or verdict form to the trial court. See *Auton*, 105 Ill. 2d at 550; *Marek*, 241 Ill. App. 3d at 870. Timely objection and submission assist the trial court in correcting the problem and prohibit the challenging party from gaining an advantage by obtaining reversal based on the party's own failure to act. *Morus v. Kapusta*, 339 Ill. App. 3d 483, 489, 791 N.E.2d 147 (2003). Furthermore, any doubts which arise from the incompleteness of the record must be resolved against the appellant, the party bearing the burden of submitting a sufficiently complete record to support its claims of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92, 459 N.E.2d 958 (1984).

In this instance, the record does not indicate that defendants tendered a remedial instruction which specifically included fault allocation to the dismissed defendant Goldberg. The jury instruction conference transcript substantiates that defendants submitted instructions covering various topics, some of which were accepted and some of which were rejected by the trial judge. However, the transcript does not disclose the contents of the rejected instructions. Furthermore, the trial judge was certain the defendants never tendered a jury instruction or verdict form which specifically included Goldberg and would not certify the purportedly missing document for our review.

Defendants cite to cases in which the appellant's failure to put an instruction in the record did not result in waiver. For example, in the land condemnation case, *Department of Public Works & Buildings v. Association of Franciscan Fathers*, 69 Ill. 2d 308, 313-14, 371 N.E.2d 616 (1977), the property owner's expert witnesses valued the land at more than triple the amount estimated by the State's expert witnesses, because they included a likely rezoning in their valuations. The property

owner tendered a jury instruction which referenced " 'the reasonable probability of rezoning' " (*Association of Franciscan Fathers*, 69 Ill. 2d at 318), but the trial judge rejected it and gave an instruction which did not address rezoning (*Association of Franciscan Fathers*, 69 Ill. 2d at 319). The jury's subsequent verdict coincided with the State's valuations. *Association of Franciscan Fathers*, 69 Ill. 2d at 317. On appeal, the State contended the jury instruction issue was waived, because the property owner had not tendered a companion instruction about the reasonable probability of rezoning. *Association of Franciscan Fathers*, 69 Ill. 2d at 319. The court disagreed, indicating that once the tendered instruction was refused, it would have been futile for the plaintiff to offer another, entirely separate instruction about the rezoning issue. *Association of Franciscan Fathers*, 69 Ill. 2d at 319. This reasoning is inapplicable to the present case, however, since there is no indication that there were any companion or supplemental instructions about the fault apportionment issue.

*People v. Rosario*, 166 Ill. App. 3d 383, 395, 519 N.E.2d 1020 (1988), is also inapplicable, because the trial judge in the present case did not expressly state that a particular instruction would be refused even if it were formally tendered.

Defendants also cite to a portion of *Rathbun v. Old Barn Restaurant*, 4 Ill. App. 3d 723, 726, 281 N.E.2d 726 (1972), in which a new trial was ordered because the judge hurried through the instruction conference, ruling on matters before they were fully presented and without allowing the plaintiff's attorney to argue for instructions which coincided with the allegations of the plaintiff's complaint. Defendants' reason for relying on *Rathbun* is unclear, since defendants are not arguing that the trial judge in this instance hurried through the proceedings.

■ Defendants contend that their continual and diligent pursuit of the fault allocation issue throughout the pretrial, trial, and posttrial phases preserved the section 2—1117 issue for review. However, none of the cited cases indicates that any of defendants' actions prior to the instruction conference were sufficient substitutes for actually tendering an alternate verdict form at the appropriate juncture in the proceedings. Furthermore, the posttrial motion was not an effective pursuit of the fault allocation issue, because, as the trial judge noted, defendants' alternate instructions or verdict form were not attached to the posttrial motion.

The facts of this case and the legal principles stated above lead us to conclude that the fault apportionment issue is indeed waived. Accordingly, we grant in part Alla Ozik's motion to strike defendants' reply brief, by striking the uncertified exhibit and all argument

concerning the fault apportionment issue, but we deny the motion in part, because it is not appropriate to strike the remaining sections of the brief concerning duty and immunity. We also deny Alla Ozik's request to sanction defendants for their conduct in this appeal.

Based on the foregoing reasoning, we affirm the judgment of the circuit court.

Affirmed; motions taken with the case granted in part and denied in part.

CAHILL and BURKE, JJ., concur.