MARK KNAUERHAZE, Plaintiff-Appellee and Cross-Appellant v. OLIVER NELSON, Special Representative of George W. Allen, Deceased, *et al.*, Defendants-Appellants and Cross-Appellees.

First District (1st Division) No. 1—03—3370

Opinion filed September 19, 2005.

John McGarry and Pamela Davis Gorkowski, both of Dykema, Gossett, Rooks, Pitts, P.L.L.C., of Chicago, for appellants.

Edward J. Walsh, of Walsh, Knippen, Knight & Diamond, Chtrd., of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff, Mark Knauerhaze, brought suit against defendants George W. Allen, M.D. (hereinafter Dr. Allen), and George W. Allen, M.D., S.C., an Illinois corporation (hereinafter Allen Corporation), alleging that Dr. Allen negligently performed surgery on his ear that resulted in permanent injuries. Dr. Allen died during trial, and on Knauerhaze's motion, the trial court appointed Oliver Nelson special representative pursuant to section 2—1008 of the Code of Civil Procedure (735 ILCS 5/2—1008 (West 2004)). On May 22, 2003, a jury found for plaintiff and awarded damages of $2,484,702. The trial court entered judgment on the verdict the same day. Defendants brought a motion for judgment notwithstanding the verdict or, alternatively, a motion for a new trial, arguing that Knauerhaze failed to provide evidence of causation. Defendants further argue that the judgment against Allen Corporation cannot stand because Knauerhaze never proved that Dr. Allen was acting as an agent of the corporation at the time of the surgery such that it could be held vicariously liable. Knauerhaze cross-appeals, alleging that the trial court improperly limited his award through a misinterpretation of section 2—1008. For the reasons that follow, we reverse.

## I. BACKGROUND

In September of 1998, Knauerhaze, an otherwise healthy man in his forties, sought treatment from Dr. Allen for hearing problems with his left ear. Knauerhaze had otosclerosis, a condition where the stapes bone of the middle ear becomes stiff and stops vibrating properly. The middle ear is comprised of three small bones, the malleus, the incus and the stapes. These bones work together to send vibrations to the inner ear where nerves then send signals to the brain. Knauerhaze had lost approximately 50% of his hearing due to the stiffening of his stapes bone.

Dr. Allen recommended a stapedotomy, a surgery where part of the stapes bone is removed and replaced by a prosthesis which is hooked onto the incus bone with a wire hook. A successful stapedotomy reestablishes the correct interplay of the middle ear bones and can lead to immediate improvement in hearing. A stapedotomy is performed with the surgeon looking into the ear through a microscope at various magnifications. A stapedotomy entails injecting anesthetic and a blood-constricting medication into the ear canal. An incision is then made and the eardrum is moved forward. The bones of the inner ear are then gently pushed to see if they are moving, or are, in fact, showing signs of otosclerosis. If the surgeon verifies that the stapes bone is not moving as it should, a cut is then made between the incus and the stapes with a tiny knife, and the incus is lifted off the top of the stapes. The loop of the prosthesis is then put over the incus bone and the prosthesis is set in place.

Knauerhaze's surgery was scheduled for September 11, 1998, as a day surgery, meaning that Knauerhaze would arrive in the morning, have the procedure, remain in the hospital for a matter of hours for rest and observation, and then return home the same day.

Knauerhaze had diminished hearing before the surgery; however, he was still able to work, drive, walk, run and otherwise participate in normal activities. After the surgery, Knauerhaze lost all hearing in his left ear. The hearing loss resulted in ongoing balance problems and vertigo, which, in turn, led to fatigue from compensating for the loss of balance. He has not been able to return to work, or drive, and is no longer able to walk with ease due to disequilibrium.

On September 8, 2000, Knauerhaze brought suit against Dr. Allen and Allen Corporation alleging that he sustained injuries due to the medical negligence of Dr. Allen. Dr. Allen was the sole stockholder of Allen Corporation, and both Dr. Allen and Allen Corporation were insured by the Illinois State Medical Inter-insurance Exchange for the total sum of $1 million.

Before the case proceeded to trial, Dr. Allen died on September 27, 2001. No letters of office were issued and no probate estate was opened on his behalf. Rather, Knauerhaze opted to proceed with the litigation by bringing a motion pursuant to section 2—1008(b), which, as shall be set out later, allows a party to proceed with an action against an opponent who dies during litigation by having a special representative appointed to defend the action. 735 ILCS 5/2—1008(b) (West 2004). Section 2—1008(b) allows the party who invokes it to avoid the formalities of opening a probate estate, but it limits the amount recoverable to the liability insurance protecting the decedent's estate. 735 ILCS 5/2—1008(b) (West 2004). On January 18, 2002, the court

granted Knauerhaze's section 2—1008(b) motion and appointed Oliver Nelson as special representative for Dr. Allen.

Dr. Allen's notes from the Knauerhaze surgery set forth certain facts of the surgery that are not in dispute. Dr. Allen noted that Knauerhaze's incus bone was much larger than normal. He then noted that in first attempting to put the wire loop of the prosthesis over the incus, the incus became subluxed, or dislocated, when the ligament supporting the incus was torn. Dr. Allen then made several more unsuccessful attempts to place the wire loop over the incus. After these attempts, Dr. Allen noted that there was blood in the vestibule of Knauerhaze's ear. Also, after these several attempts, Dr. Allen noted that Knauerhaze began to retch, broke out into a cold dripping sweat, became nauseated and started to vomit on the operating table. At the same time, Knauerhaze's eyes began to rapidly flick from the left to right, a condition known as nystagmus. At that point, Dr. Allen terminated the surgery and packed Knauerhaze's ear with gel foam. In addition, Dr. Allen saw Knauerhaze a week after the surgery on September 27, 1999, for a follow-up appointment. Dr. Allen's notes from this appointment indicated that he removed the packing from Knauerhaze's ear and that he was still very dizzy. Dr. Allen also indicated that Knauerhaze's hearing was still very bad, that he had mild spontaneous nystagmus to the right, and there was a purulent discharge from the ear.

At trial, Knauerhaze called Dr. Ralph Nelson as an expert witness. Dr. Nelson looked at the operative report and notes of Dr. Allen as well as other medical records and a surveillance tape taken of the plaintiff to make his opinion. Dr. Nelson testified that Dr. Allen was negligent in not properly sizing the wire loop of the prosthesis to fit over Knauerhaze's large incus bone. Dr. Nelson explained that a subluxed incus becomes totally flaccid and loose and it is significantly more difficult to place the prosthesis loop over a subluxed incus. In Dr. Nelson's opinion, a reasonably well-qualified ear surgeon would have terminated the surgery after subluxing the incus and would have allowed it to heal over a period of months before making any further attempts. According to Dr. Nelson, a prosthesis should not be attached to a subluxed incus because the prosthesis can then go too far into the inner ear and cause damage.

Dr. Nelson also testified that Dr. Allen was negligent in failing to initially open the prosthesis loop wider after noting the large size of Knauerhaze's incus. He further testified that if the prosthesis loop does not initially go over the incus with ease, it should be removed and resized to fit over the bone.

Dr. Nelson acknowledged that the act of subluxing the incus did

not, in itself, cause any damage to the nerves of the inner ear. However, Dr. Nelson testified that the retching, sweating, nausea, vomiting, and nystagmus that occurred after Dr. Allen had made several unsuccessful attempts to place the prosthesis loop over the incus were signs of inner ear damage. Furthermore, in Dr. Nelson's opinion, if Dr. Allen had stopped the surgery immediately after subluxing the incus, Knauerhaze would not have had any further injury to his inner ear and no permanent problems.

The defendant's expert, Dr. Thomas Haberkamp, based his testimony on the same documents as Dr. Nelson and, in addition, he examined Knauerhaze on February 27, 2002. Dr. Haberkamp testified that Dr. Allen complied with the applicable standard of care and was not negligent in operating on the plaintiff. According to Dr. Haberkamp, subluxing the incus is a known and accepted complication of the surgery and does not amount to negligence. Dr. Haberkamp further testified that although it is more difficult to place a prosthesis loop over a subluxed incus, it is not negligent to do so, and it is actually the best way to stabilize a flaccid incus. Additionally, according to Dr. Haberkamp, Dr. Allen's attempts to place the prosthesis loop over the subluxed incus did not cause the complications that followed. Rather, Dr. Haberkamp opined that Knauerhaze's complications were caused by labyrinthitis, which is an inflamation of the inner ear that can be caused by infection or through the introduction of blood into the inner ear. Dr. Haberkamp further testified that labyrinthitis can occur in the absence of negligence and that because blood is always incident to ear surgery, it is always possible for it to travel from the middle ear to the inner ear and cause irritation. Knauerhaze's symptoms of retching, sweating, nausea, vomiting and nystagmus during the surgery were consistent with labyrinthitis, according to Dr. Haberkamp, as was the purulent discharge noted by Dr. Allen in the postoperative period.

Knauerhaze's original complaint dated September 8, 2000, contained the following allegation as count II, paragraph 1:

> "At all times relevant to this cause of action, Defendant, George W. Allen, M.D., was and is a physician licensed in Illinois and practiced in the field of otolaryngology and he was an authorized agent, servant and/or employee of George W. Allen, M.D., S.C., an Illinois corporation located in Chicago, Cook County, Illinois."

Defendants admitted this allegation in their answer. However, defendants denied count II, paragraph 2, which stated as follows:

> "At all times relevant to this cause of action, Mark Knauerhaze, was under the care and treatment of George W. Allen, M.D., S.C., through its duly authorized agent, George W. Allen, M.D., for purposes of receiving medical care and treatment."

On May 22, 2003, Knauerhaze amended his complaint to properly recite the remaining defendants and to conform the allegations to Supreme Court Rule 213 (134 Ill. 2d R. 213) opinions that were disclosed during pretrial discovery. The amended complaint contained an allegation identical to the allegation in count II, paragraph 1, from the first complaint. However, in its answer to the amended complaint, Allen Corporation did not simply admit this allegation as it previously had but answered as follows:

"George W. Allen, M.D., S.C. admits Dr. Allen was a physician licensed in Illinois and practiced in the field of otolaryngology and makes no answer to the allegations contained in [this allegation] of the Plaintiff's First Amended Complaint at Law because they call for a legal conclusion."

In addition, Knauerhaze made a request pursuant to Supreme Court Rule 237 (134 Ill. 2d R. 237) for certain information to be produced at trial. Defendants filed their response to this request on May 23, 2003, at the beginning of trial. In that response, defendants stated: "Dr. George Allen was insured for $1 million and [Allen Corporation] was covered by Dr. Allen's policy because he was the sole shareholder of the corporation."

Defendants moved for a directed verdict at the close of plaintiff's case and again at the close of their case. The jury returned a verdict for the plaintiff in the amount $2,484,702. On July 3, 2003, defendants then filed a posttrial motion for judgment notwithstanding the verdict and for remittitur. The trial court denied in part and granted in part defendants' posttrial motion. The court did not reduce the amount of judgment as sought but, rather, enforced section 2—1008 with respect to Oliver Nelson as special representative of Dr. Allen.

Subsequently, on July 23, 2003, Knauerhaze opened a probate estate for Dr. Allen and filed a petition for probate of will and for letters of administration. Letters of office were issued for Dr. Allen's estate on September 9, 2003, and the Northern Trust Company (hereinafter Northern Trust) was appointed as the independent executor. On October 20, 2003, Knauerhaze also successfully moved to have Northern Trust substituted as defendant in lieu of the special representative, Oliver Nelson.

On appeal, defendants argue that they are entitled to judgment notwithstanding the verdict because Knauerhaze failed to prove the cause element of the medical negligence cause of action. Defendants contend that Knauerhaze's expert, Dr. Nelson, did not establish how Knauerhaze's inner ear was damaged, but merely established a condition, rather than a cause of the injury. Alternatively, defendants argue that they are entitled to a new trial because the jury's conclusions

were against the manifest weight of the evidence because there was no proof of cause. Defendants next contend that the trial court erred in denying their motion for judgment notwithstanding the verdict with respect to Allen Corporation because plaintiff failed to provide any evidence at trial of an agency relationship between Dr. Allen and Allen Corporation that would support a judgment against Allen Corporation for vicarious liability.

Knauerhaze contends that his expert, Dr. Nelson, did provide testimony establishing that Dr. Allen's negligence caused the injuries. In this regard, he appears to argue that the injury as evidenced by the various symptoms Knauerhaze presented during surgery was caused by Dr. Allen's repeated unsuccessful attempts to place the prosthesis loop. Knauerhaze further contends that the defendants' answer to the first complaint constituted a judicial admission, and the fact of agency was, therefore, removed from issue. Knauerhaze further argues that defendants' Rule 237 response admitted agency and should also be considered a judicial admission. Finally, Knauerhaze contends that defendants' failure to submit agency jury instructions constituted a waiver of the issue.

Additionally, Knauerhaze cross-appeals the trial court's determination to limit his recovery against Dr. Allen to the amount of his insurance coverage pursuant to section 2—1008(b). In this regard, Knauerhaze contends that section 2—1008 does not limit a plaintiff's ability to pursue an unsatisfied judgment against a defendant decedent's probate estate when there is a subsequent timely made claim against the estate. Knauerhaze additionally argues that limiting his ability to pursue a claim against Dr. Allen's probate estate after the invocation of section 2—1008 constitutes an unconstitutional legislative remittitur.

## II. ANALYSIS OF APPEAL

■ Defendants' first contention on appeal is that the trial court erred in not granting their motion for judgment notwithstanding the verdict because Knauerhaze failed to prove an essential element of negligence. A judgement notwithstanding the verdict presents a question of law that appellate courts review *de novo*. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999). A trial court should enter judgment notwithstanding the verdict only when all the evidence, viewed in a light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could stand based on the evidence. *McClure*, 188 Ill. 2d at 132, 720 N.E.2d at 257; *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). Our supreme court further

described the standard in *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53, 603 N.E.2d 508, 512 (1992):

> "A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable. [Citations.] Likewise, the appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple*, 151 Ill. 2d at 452-53, 603 N.E.2d at 512.

Thus, the standard for obtaining a judgment notwithstanding the verdict is a " 'very difficult standard to meet,' " and limited to " 'extreme situations only.' " *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1125, 738 N.E.2d 542, 547 (2000), quoting *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 714, 631 N.E.2d 266 (1994).

The plaintiff in a negligence action must establish that the defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff incurred injuries proximately caused by that breach. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114, 649 N.E.2d 1323, 1326 (1995). The existence of a duty is a question of law for the court to decide, while the issues of breach and proximate cause are factual matters for the jury to decide, provided there is a genuine issue of material fact regarding those issues. *Espinoza*, 165 Ill. 2d at 114, 649 N.E.2d at 1326; *Thompson v. County of Cook*, 154 Ill. 2d 374, 382, 609 N.E.2d 290, 293 (1993).

Defendants do not contest the existence of a duty owed by Dr. Allen to Knauerhaze. Nor do they not contest that Knauerhaze suffered some injury. Rather, they primarily contend that Knauerhaze failed to establish the element of proximate cause because his expert, Dr. Nelson, did not testify to any causal link between Dr. Allen's actions and Knauerhaze's subsequent injuries. Defendants additionally dispute the breach element of negligence by denying that Dr. Allen acted negligently in either subluxing the incus or continuing the surgery. However, their primary argument on appeal is on the element of cause. Defendants contend that continuing the surgery after subluxing the incus should not be viewed as the proximate cause of Knauerhaze's injury because it merely created the condition in which the injury could occur. They further argue that even if Dr. Allen's negligence was a cause in fact of the injury, it was not the legal cause. For these reasons, defendants argue, the jury did not have sufficient evidence to return a verdict for Knauerhaze.

■ The proximate cause element of negligence consists of both

"cause in fact" and "legal cause." *Thacker v. UNR Industries, Inc.,* 151 Ill. 2d 343, 354, 603 N.E.2d 449, 455 (1992). "Cause in fact" involves the question of whether the defendant's negligence had any effect in producing the other's harm, or whether the harm was caused by some other factors. See Restatement (Second) of Torts § 431, Comment *b*, at 429 (1965); *Thacker,* 151 Ill. 2d at 354-55, 603 N.E.2d at 455.

> "A defendant's conduct is a 'cause in fact' of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury. [Citations.] A defendant's conduct is a material element and substantial factor in bringing about the injury if, absent that conduct, the injury would not have occurred." *Abrams v. City of Chicago,* 211 Ill. 2d 251, 258, 811 N.E.2d 670, 675 (2004).

"Legal cause," on the other hand, examines the foreseeability of the injury, or whether the injury is "of a type which a reasonable man would see as a likely result of his conduct." *Lee v. Chicago Transit Authority,* 152 Ill. 2d 432, 456, 605 N.E.2d 493, 503 (1992).

■ A plaintiff must generally prove the elements of a medical negligence cause of action through medical expert testimony. See *Seef v. Ingalls Memorial Hospital,* 311 Ill. App. 3d 7, 15, 724 N.E.2d 155, 122 (1999); *Mengelson v. Ingalls Health Ventures,* 323 Ill. App. 3d 69, 74, 751 N.E.2d 91, 95 (2001); *Northern Trust Co. v. University of Chicago Hospitals & Clinics,* 355 Ill. App. 3d 230, 242, 821 N.E.2d 757, 768 (2004). In order to sustain the burden of proof, a plaintiff's expert must demonstrate within a reasonable degree of medical certainty that the defendant's breach in the standard of care is more probably than not the cause of the injury. *Mengelson,* 323 Ill. App. 3d at 74, 751 N.E.2d at 95; *Northern Trust Co.,* 355 Ill. App. 3d at 242, 821 N.E.2d at 768. A plaintiff does not need to present unequivocal or unqualified evidence of causation but can meet his burden through the introduction of circumstantial evidence from which a " 'jury may infer other connected facts which usually and reasonably follow according to *** common experience.' [Citation.]" *Thacker,* 151 Ill. 2d at 357, 603 N.E.2d at 455. Moreover, "an expert may give an opinion without disclosing the facts underlying that opinion," and "[t]he burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion." *Wilson v. Clark,* 84 Ill. 2d 186, 194, 417 N.E.2d 1322, 1326 (1981) (adopting Federal Rule of Evidence 705 (Fed. R. Evid. 705)). Nevertheless, proximate cause is not established where the medical expert testimony of the causal connection is " 'contingent, speculative or merely possible.' " *Mengelson,* 323 Ill. App. 3d at 75, 751 N.E.2d at 95, quoting *Newell v. Corres,* 125

Ill. App. 3d 1087, 1092, 466 N.E.2d 1085, 1088 (1984). However, "the relative weight, sufficiency and credibility assessed to medical expert testimony is 'peculiarly within the province of the jury' [citation], as is, ultimately, the resolution of evidentiary conflicts with respect to the factual question of proximate cause." *Northern Trust Co.*, 355 Ill. App. 3d at 242, 821 N.E.2d at 768.

■ Although the question is a close one, the jury arguably had sufficient evidence to find that Dr. Allen's negligence was the cause in fact of Knauerhaze's injuries. The jury was presented with the testimony of two experts with generally conflicting opinions. However, as noted, our task is not to reweigh the evidence and make our own determinations. *Maple*, 151 Ill. 2d at 453, 603 N.E.2d at 512. Rather, we need only determine if the evidence so overwhelmingly favors defendants that the judgment cannot stand. *McClure*, 188 Ill. 2d at 132, 720 N.E.2d at 257. Thus, we view the evidence in a light most favorable to Knauerhaze. *McClure*, 188 Ill. 2d at 132, 720 N.E.2d at 257. As noted, Dr. Nelson testified that Dr. Allen was negligent in several regards. He testified that Dr. Allen was negligent in subluxing the incus because he did not initially size the wire loop of the prosthesis given the large size of the incus. Next, Dr. Allen was negligent in not removing the prostheses and resizing the loop once it did not easily slip over the incus. Dr. Allen was further negligent in making several attempts to place the prosthesis on the negligently subluxed incus. Dr. Nelson testified that a reasonably well-qualified surgeon would not continue to attempt the procedure after subluxing the incus because things were starting to go bad and proceeding was inviting a problem. Dr. Nelson testified that a stapedotomy generally takes 20 to 45 minutes; however, Dr. Haberkamp admitted on cross-examination that Dr. Allen continued the surgery for approximately 35 minutes after the point he subluxed the incus. Finally, Dr. Nelson testified that although the initial subluxation of the incus, in and of itself, did not cause any damage to the inner ear, no damage would have occurred if Dr. Allen had stopped the procedure immediately after that point.

Although Dr. Haberkamp disputed Dr. Nelson's opinions in these regards, such disputes are the very type that juries are expected to resolve through their considered weighing of the relative merit of the experts and their positions. *Northern Trust Co.*, 355 Ill. App. 3d at 242, 821 N.E.2d at 768. Thus, it was clearly within the jury's purview to give greater weight to Dr. Nelson's opinion than to Dr. Haberkamp's contrary opinion. Dr. Nelson's testimony clearly established evidence through which the jury could conclude that Dr. Allen breached his duty of care. Moreover, Dr. Nelson testified that Dr.

Allen's breach of his duty resulted in Knauerhaze's injuries. Thus, the jury had evidence through which to infer that Dr. Allen caused the injury when he made several negligent and unsuccessful attempts to place a too-small wire prosthesis loop on a subluxed incus. Keeping in mind the standard applicable to expert testimony (see *Mengelson*, 323 Ill. App. 3d at 74, 751 N.E.2d at 95; *Northern Trust Co.*, 355 Ill. App. 3d at 242, 821 N.E.2d at 768; *Wilson*, 84 Ill. 2d at 194, 417 N.E.2d at 1326), and the standard of review applicable to an appeal of a denial of a judgment notwithstanding the verdict (see *Maple*, 151 Ill. 2d at 453, 603 N.E.2d at 512), we cannot conclude that the jury's determination on the issue of cause in fact was unfounded.

■ Defendants next contend, relying on *Simmons v. Garces*, 198 Ill. 2d 541, 763 N.E.2d 720 (2002), that Knauerhaze failed to prove that Dr. Allen was the legal cause of Knauerhaze's injury. In *Simmons*, the plaintiff took her child to the defendant's clinic, but the defendant physician did not examine the child. *Simmons*, 198 Ill. 2d at 544-45, 763 N.E.2d at 724-25. Later that day, the child was taken to a hospital emergency room but was dead upon arrival. *Simmons*, 198 Ill. 2d at 546, 763 N.E.2d at 725. At trial, plaintiff's expert testified that the child suffered from severe dehydration, which contributed to her death, and that defendant's failure to examine the child constituted negligence. *Simmons*, 198 Ill. 2d at 547, 763 N.E.2d at 726. The jury answered "No" to the special interrogatory: "Did dehydration contribute to cause the death of [the child]?" *Simmons*, 198 Ill. 2d at 553, 763 N.E.2d at 729. However, the jury found for the plaintiff. *Simmons*, 198 Ill. 2d at 553, 763 N.E.2d at 729. The trial court found that the special interrogatory was controlling and entered judgment in favor of the defendants. *Simmons*, 198 Ill. 2d at 553, 763 N.E.2d at 724. The supreme court affirmed the judgment for defendants based on the plaintiff's failure to prove proximate cause. *Simmons*, 198 Ill. 2d at 574-75, 763 N.E.2d at 741. The court noted that even if the defendant's failure to examine the child constituted a cause in fact of the child's death, the failure to examine could not be considered the legal cause because the only cause of death linked by expert testimony to the defendant's conduct was dehydration. *Simmons*, 198 Ill. 2d at 559, 763 N.E.2d at 732.

Defendants contend that the instant case is like *Simmons* in that even if Dr. Allen's failure to stop the surgery was a cause in fact of Knauerhaze's injury, it could not be the legal cause. They argue that because the *Simmons* court refused to hold the physician liable even though he may have been the cause in fact of the injuries, we should similarly refuse to hold them liable even though Dr. Allen's negligence may have been the cause in fact of Knauerhaze's injuries. However,

the applicability of *Simmons* to the instant case is limited. *Simmons* cites the rule that proximate cause consists of both cause in fact and legal cause, and there is no question that this rule applies here. But the holding in *Simmons* was based on the jury affirmatively refuting a basic premise of the plaintiff's theory of causation through its answer to a special interrogatory and thereby negating the possibility that the defendant's negligence was the legal cause of the death. The jury in the instant case made no such finding. Rather, the jury found defendants liable for negligence without specifically indicating the cause on which it based its determination. Thus, *Simmons* applies only insofar as it generally reflects the rule of law with regard to proximate cause.

As with cause in fact, the jury here had sufficient evidence on which to conclude that Dr. Allen's attempts to place the improperly sized loop of the prosthesis on a subluxed incus was the legal cause of the injuries. As noted, a defendant will be held liable for negligent conduct when the injury caused is foreseeable, or, in other words, it is "of a type which a reasonable man would see as a likely result of his conduct." *Lee*, 152 Ill. 2d at 456, 605 N.E.2d at 503. Dr. Nelson's testimony established that Dr. Allen breached the standard of care applicable to ear surgeons in several regards. He stated that a reasonably well-qualified surgeon would not attempt to place a prosthesis on a subluxed incus because to do so is to invite problems. Based on this opinion, the jury could infer that it was reasonably foreseeable that the act committed by Dr. Allen would cause inner ear injury.

Thus, we conclude that when viewed in a light most favorable to Knauerhaze, the jury had sufficient evidence to conclude that Dr. Allen proximately caused the injury when he made several negligent attempts to place the prosthesis loop on the subluxed incus. However, even if the jury did not infer that any specific act of Dr. Allen caused Knauerhaze's injuries, we still believe that its determination should stand based solely on the fact that the injury occurred during a portion of the surgery that was unwarranted.

Viewing the evidence in a light most favorable to Knauerhaze, we find that the jury had ample evidence on which to conclude that Dr. Allen's negligent continuation of the surgery was the cause in fact of the injury. First, Dr. Nelson testified that it was a breach of the standard of care for Dr. Allen to continue the surgery after subluxing the incus. Next, both experts agreed that Dr. Allen's notes indicated that blood entered the vestibule of Knauerhaze's ear only after the incus was subluxed. Additionally, both experts agreed that Dr. Allen reported the symptoms of inner ear injury (the retching, vomiting, nausea, sweating, and nystagmus) as occurring contemporaneously

with the blood entering the vestibule and after the incus was sub-luxed. Both experts agreed that the risk of internal bleeding is always present throughout the duration of any stapes surgery and there is a constant risk that blood will enter the inner ear so as to cause irrita-tion or damage like that suffered by Knauerhaze. Thus, the jury was presented with expert testimony which it was free to accept that Dr. Allen was negligent in continuing the surgery, that the blood entered the inner ear after the point where continuation of the surgery was negligent, that the symptoms of inner ear injury occurred after the point continuation of the surgery was negligent, and that blood enter-ing the inner ear can cause the type of injuries Knauerhaze sustained. Furthermore, Dr. Nelson testified that if Dr. Allen had terminated the procedure immediately after subluxing the incus, no injury would have resulted. Thus, Dr. Allen's negligent continuation of the surgery extended the period that Knauerhaze would be exposed to the risks of surgery. Based on these testimonial facts, the jury could conclude that Dr. Allen's negligent continuation of the surgery, without any ad-ditional specific act of negligence, was the cause in fact of Knauer-haze's injuries because absent that conduct, blood would not have infiltrated the inner ear and caused injury. See *Abrams*, 211 Ill. 2d at 258, 811 N.E.2d at 675.

■ Defendants contend that Knauerhaze's expert merely estab-lished the condition in which the injury occurred rather than the cause of the injury. Defendants cite *Thompson v. County of Cook*, 154 Ill. 2d 374, 609 N.E.2d 290 (1993), for the distinction between condi-tion and cause. In that case, the court noted:

"Illinois courts have long distinguished \*\*\* between condition and causation. \*\*\* 'The cause of an injury is that which actually produces it, while the occasion is that which provides an op-portunity for causal agencies to act.' If a defendant's negligence does nothing more than furnish a condition by which injury is made possible, that negligence is not the proximate cause of injury." *Thompson*, 154 Ill. 2d at 383, 609 N.E.2d at 294, quoting *Briske v. Village of Burnham*, 379 Ill. 193, 199, 39 N.E.2d 976, 979 (1942), and citing *Merlo v. Public Service Co.*, 381 Ill. 300, 306, 45 N.E.2d 665, 675 (1942).

However, in *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 720 N.E.2d 1068 (1999), our supreme court elucidated that the condition/cause analysis is really nothing more than another way of asking whether the defendant's actions satisfy the cause-in-fact aspect of proximate cause. *Galman*, 188 Ill. 2d at 259, 720 N.E.2d at 1073; accord *Abrams*, 211 Ill. 2d at 258, 811 N.E.2d at 675. In *Galman*, the plaintiff urged the court to abandon the condition/cause distinction

and exclusively use the proximate cause standard as described in *Lee*, 152 Ill. 2d at 455, 605 N.E.2d at 503 (describing proximate cause as consisting of cause in fact and legal cause). *Galman*, 188 Ill. 2d at 257-58, 720 N.E.2d at 1072. However, the court rejected plaintiff's position that the two approaches were wholly incompatible. *Galman*, 188 Ill. 2d at 258, 720 N.E.2d at 1072. The court noted that while *Lee* addressed proximate cause in general terms, the cases that employed the condition/cause distinction, *Briske*, *Merlo*, and *Thompson*, for instance, involved a subset of negligence cases "in which the plaintiff's injury results not from the defendant's negligence directly but from the subsequent, independent act of a third person." *Galman*, 188 Ill. 2d at 259, 720 N.E.2d at 1072. The court then posited:

"When *Briske*, *Merlo*, and *Thompson* ask whether the defendant's conduct was a cause of the injury or simply furnished a condition by which the injury was made possible, they are in effect asking whether the defendant's conduct was a material and substantial element in bringing about the injury. Similarly, when *Briske*, *Merlo*, and *Thompson* ask whether the defendant might have reasonably anticipated the intervening efficient cause as a natural and probable result of his or her own negligence, they are in effect asking whether the intervening efficient cause was of a type that a reasonable person would see as a likely result of his or her conduct." *Galman*, 188 Ill. 2d at 259, 720 N.E.2d at 1072.

There is no contention in the instant case that Knauerhaze's injuries were caused by an intervening third party as was the case in those cases that have employed the condition/cause distinction. See *Briske*, 379 Ill. 193, 39 N.E.2d 976; *Merlo*, 381 Ill. 300, 45 N.E.2d 665; *Thompson*, 154 Ill. 2d 374, 609 N.E.2d 290; *Galman*, 188 Ill. 2d 252, 720 N.E.2d 1068. Nevertheless, *Galman* makes clear the condition/cause inquiry is merely another way of asking whether something was the cause in fact of an injury. See *Galman*, 188 Ill. 2d at 259, 720 N.E.2d at 1073; *cf. Abrams*, 211 Ill. 2d at 258, 811 N.E.2d at 675 (describing cause in fact using "material element and a substantial factor" language). Thus, defendants' claim that Dr. Allen's failure to terminate the surgery merely created a condition in which an injury could occur is tantamount to saying that Dr. Allen's negligence was not the cause in fact of Knauerhaze's injury, which, as noted, was a contention that the jury reasonably declined to follow.

Furthermore, the jury could have found that Dr. Allen's negligent continuation of the surgery was also the legal cause of the injury. Both experts testified that inner ear injury is a risk of stapes surgery. Dr. Nelson testified to the statistical failure rate of stapes surgeries, stating that 10% fail to restore hearing and approximately 2% lead to

further hearing impairment due to the development of scar tissue, infection, blood vessel spasm, irritation of the inner ear or a leak of inner ear fluid. Dr. Haberkamp testified that labyrinthitis is a known risk of stapes surgery, that it can be caused by blood entering the vestibule, and that it can be caused in the absence of negligence. However, Dr. Haberkamp did not put a statistical limit on the frequency of this known complication. Thus, there was sufficient evidence from which to infer that any reasonably well-qualified ear surgeon would have been aware that inner ear injury was a risk of ill-advisedly extending the duration of a stapedotomy and, moreover, that in this specific case, that risk would not have materialized had Dr. Allen, in fact, terminated the surgery when he should have.

Although the statistical probability that stapes surgery will further impair hearing was generally established at 2% by Dr. Nelson, that statistic does not address whether those surgeries surveyed were negligently extended in time and lends itself, we believe, to a reasonable possibility that the actual likelihood of further impairment under such circumstances would exceed the 2% estimate. More overridingly, however, the extent to which a risk must be foreseeable to trigger liability should not be as significant where that particular risk is not essential to establish whether there is a breach of duty. The rationale that a harm must be reasonably foreseeable in order to satisfy the requirements of proximate cause so as to impose a duty and define its breach is to limit the extent to which a potential tortfeasor must regulate his conduct in order to avoid the possibility of injuring another. See generally W. Keeton, Prosser & Keeton on Torts § 42, at 274 (5th ed. 1984). As a matter of policy, if the risk of injury is too remote it does not justify the regulation of a potential defendant's conduct by imposing the burden of a duty to avoid that particular risk. However, that rationale requiring that an injury be likely would not be fully applicable to consequential damages where the duty of care was already breached for other reasons that satisfied the elements of proximate cause. Thus, in this case, the possibility of blood infiltrating the inner ear and damaging it through the continuation of surgery need not be as foreseeable since the duty and its breach were already defined by the fact that the surgery clearly extended beyond the point where it should have been aborted and, as Dr. Nelson testified, extending the surgery was "inviting a problem."

■ In this case, the duty to abort the surgery was imposed by the professional standard of care, which sought to avoid unnecessary and possibly risky continued attempts to attach a prosthesis to a subluxed incus. As noted, Dr. Nelson testified that a "reasonably well-qualified surgeon would stop because things are starting to go bad, and to

proceed is inviting a problem." Thus, the jury was free to conclude that under the prevailing standard of care, the continuation of the surgery after the initial unsuccessful attempt was not only unnecessary, but was laden with risk. There can be no question under this test that the continuation of surgery under these circumstances constituted a breach of duty. Once the duty has been established and a breach has taken place, the consequential injuries to the inner ear resulting, not from the prosthesis pushing into the inner ear, but from a collateral consequence, namely, the flow of blood—a risk incidental to any ear surgery—became simply an element of damage rather than an increment in defining the duty. As such, the likelihood of its occurrence is of lesser import than it would be if that risk was incremental in defining the duty in the first instance.

This conclusion is all the more appropriate in this instance where the injury the standard of care was designed to avoid, namely, injury to the inner ear, is the same injury that actually occurred. Even though, according to the testimony of Dr. Nelson, the standard of care requiring the termination of stapes surgery when the incus is subluxed focused on the possible risk of the penetration of the prosthesis rather than blood leakage, which was more likely to account for the injury in this case since there is no evidence that the prosthesis was ever attached, it does not seem an undue burden to impose liability for damages that were consequential to Dr. Allen's breach of duty under these circumstances. We note, too, that although legal cause is generally defined by foreseeability (*Lee*, 152 Ill. 2d at 456, 605 N.E.2d at 503), it is also said that the extent of the harm or the exact manner in which it occurs need not be foreseeable. *Colonial Inn Motor Lodge, Inc. v. Gay*, 288 Ill. App. 3d 32, 45, 680 N.E.2d 407, 416 (1997). This is not a case where the injuries or the manner of their occurrence are far-fetched or wholly unforeseeable. Rather, it was a known risk that blood could infiltrate the inner ear and cause damage. Furthermore, this is not an "unforeseeable plaintiff" case such as was dealt with in the famous Cardozo-Andrews debate in the case of *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). See W. Keeton, Prosser & Keeton on Torts § 43, at 284 (5th ed. 1984) (describing *Palsgraf* as dealing with the foreseeability of the plaintiff rather than of the consequences). Rather, here, there is no question that Dr. Allen owed a duty directly to Knauerhaze. Thus, the jury could have inferred that Dr. Allen's negligent continuation of the surgery was the proximate cause of Knuaerhaze's injuries because it unreasonably exposed him to known risks of surgery that did, in fact, come to pass. We therefore affirm the trial court's denial of defendants' motion for judgment notwithstanding the verdict on the negligence issue.

■ Defendants alternatively contend that the trial court erred in failing to grant them a new trial because the verdict was against the manifest weight of the evidence. Defendants reiterate the substantive arguments made in their appeal of the denial of their motion for judgment notwithstanding the verdict. A motion for a new trial, however, is subject to different standards at both the trial and appellate levels. A trial court should grant a new trial if, in the exercise of its discretion, it finds that the verdict is against the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 456, 603 N.E.2d at 513. " 'A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.' " *Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512-13, quoting *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1087, 560 N.E.2d 969, 973 (1990). The appellate standard of review applicable to a trial court's determination on a motion for a new trial is abuse of discretion. *Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513. "In [considering] whether a trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial." *Maple*, 151 Ill. 2d at 455, 603 N.E.2d at 513, citing *Reidelberger v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 549, 416 N.E.2d 268 (1981). For the reasons discussed above, we find that the trial court did not abuse its discretion in finding that the jury's verdict was not against the manifest weight of the evidence. We therefore affirm the trial court's denial of defendants' motion for a new trial on the negligence issue.

■ Defendants next argue that the trial court erred in denying judgment notwithstanding the verdict or directing a verdict in favor of Allen Corporation because there was no evidence presented at trial to show that Dr. Allen was acting as an agent of Allen Corporation when he performed the surgery. Knauerhaze first contends that defendants' answer to count II, paragraph 1, constituted a judicial admission to the agency relationship that could not later be denied. Defendants contend that their original answer did not constitute evidence of agency because it was superseded by their answer to Knauerhaze's amended complaint and was never admitted into evidence at trial.

As a general rule, a statement of fact that has been admitted in a pleading is a judicial admission and is binding on the party making it. *State Security Insurance Co. v. Linton*, 67 Ill. App. 3d 480, 484, 384 N.E.2d 718, 722 (1978). Judicial admissions are not evidence and need not be introduced as evidence at trial. J. Strong, McCormick on Evidence § 254, at 142 (4th ed. 1992). Rather, judicial admissions "are formal concessions in the pleadings in the case or stipulations by a

party or its counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." J. Strong, McCormick on Evidence § 254, at 142 (4th ed. 1992); see also J. Wigmore, Evidence § 1064, at 536 (2d ed. 1923); *Linton*, 67 Ill. App. 3d at 484, 384 N.E.2d at 722. In contrast to judicial admissions, evidentiary admissions must be offered into evidence and are always subject to contradiction or explanation. J. Strong, McCormick on Evidence § 254, at 142 (4th ed. 1992). An admission in an unverified pleading signed by an attorney is binding on the party as a judicial admission. *Linton*, 67 Ill. App. 3d at 484, 384 N.E.2d at 722. However, once a pleading is amended, an admission made in an *unverified* original pleading can only be used as an evidentiary admission and not as a judicial admission. *Yarc v. American Hospital Supply Corp.*, 17 Ill. App. 3d 667, 670, 307 N.E.2d 749, 752 (1974); *Galiher v. Spates*, 129 Ill. App. 2d 204, 207, 262 N.E.2d 626, 628 (1970) ("The prior answer was not verified and, being superseded by an amended answer, does not have the effect of an admission"); *Pettigrew v. Putterman*, 331 Ill. App. 3d 633, 641, 771 N.E.2d 1008, 1014 (2002). In contrast, original *verified* pleadings will remain binding as judicial admissions even after the filing of an amended pleading which supersedes the original unless the amended pleading discloses that the original pleading was made through mistake or inadvertence. *In re Marriage of Osborn*, 206 Ill. App. 3d 588, 594, 564 N.E.2d 1325, 1328 (1990); *American National Bank & Trust Co. of Chicago v. Erickson*, 115 Ill. App. 3d 1026, 1029, 452 N.E.2d 3, 6 (1983); *Montgomery Ward & Co. v. Wetzel*, 98 Ill. App. 3d 243, 251, 423 N.E.2d 1170, 1177 (1981).

In this case, all of the relevant pleadings were unverified. In their answer to Knauerhaze's amended complaint, defendants refused to answer the allegation that Dr. Allen was, "at all times relevant," an agent of Allen Corporation because it called for a legal conclusion. Thus, defendants' original answer to Knauerhaze's original complaint lost its status as a judicial admission once that pleading was amended. See *Yarc*, 17 Ill. App. 3d at 670, 307 N.E.2d at 752; *Galiher*, 129 Ill. App. 2d at 207, 262 N.E.2d at 628; *Pettigrew*, 331 Ill. App. 3d at 641, 771 N.E.2d at 1014. Moreover, although defendants' original answer retained potential evidentiary value, Knauerhaze did not introduce the original answer as evidence at trial. Thus, defendants' original answer did not provide proof of an agency relationship at trial. See J. Strong, McCormick on Evidence § 254, at 142 (4th ed. 1992); *Pettigrew*, 331 Ill. App. 3d at 641-42, 771 N.E.2d at 1014.

Knauerhaze next contends that defendants' response to their Supreme Court Rule 237 notice to produce constituted a judicial admission of agency and that the trial court was correct in denying

defendants' posttrial motion on this basis. As noted, in that response, defendants stated: "Dr. George Allen was insured for $1 million and [Allen Corporation] was covered by Dr. Allen's policy because he was the sole shareholder of the corporation."

As noted, judicial admissions are formal concessions or stipulations that withdraw a fact from issue and dispense of the need of proof of the fact. J. Strong, McCormick on Evidence § 254, at 142 (4th ed. 1992). As such, to constitute a judicial admission, the admission must clearly and unequivocally admit to the fact that is being removed from issue. See *Young v. Pease*, 114 Ill. App. 3d 120, 122-23, 448 N.E.2d 586, 588 (1983). That determination cannot be made without viewing the proffered statement in the context in which it was made, which, in this case, would necessarily require an opportunity to review the Rule 237 elicitation to which this statement purportedly responded. Since the parties have failed to include the Rule 237 notice to which the response was made as part of this record, it would be less than thorough for this court to determine, solely from the face of the response itself, that it rises to the level of a judicial admission. However, more overridingly, even if that statement were determined to be a judicial admission, it would not be sufficient to satisfy Knauerhaze's burden to prove agency.

"Agency is a consensual, fiduciary relationship between two legal entities created by law, where the principal has the right to control the activities of the agent, and the agent has the power to conduct legal transactions in the name of the principal." *Caligiuri v. First Colony Life Insurance Co.*, 318 Ill. App. 3d 793, 801, 742 N.E.2d 750, 756 (2000). A principal will only be held vicariously liable for the negligence of an agent if the agent was acting within the scope of his employment at the time of the negligent conduct. *Pyne v. Witmer*, 129 Ill. 2d 351, 359, 543 N.E.2d 1304, 1308 (1989). When the facts relied upon to establish the existence of an agency relationship are conflicting, or conflicting inferences can be drawn from them, the question is one of fact for the jury (3 Am. Jur. 2d *Agency* § 352 (2002)), and the existence of an agency relationship must be proved by a preponderance of the evidence. *Granite Properties Ltd. Partnership v. Granite Investment Co.*, 220 Ill. App. 3d 711, 714, 581 N.E.2d 90, 92 (1991). Knauerhaze cites no authority for his contention that being a sole shareholder of a corporation or sharing liability insurance with a corporation automatically makes an individual an agent of that corporation. Nor could this court find any support for the contention that those facts, in and of themselves, establish agency such that Knauerhaze was relieved of his burden to prove the relationship. Moreover, no argument was made that an "S.C." ("Service Corpora-

tion," as described in the Medical Corporation Act (805 ILCS 15/4 (West 2004))) as opposed to any other corporate form, is any more likely to support Knauerhaze's contention that sole stock ownership automatically equates to an agency relationship. Thus, even if an inference of agency could potentially be drawn from these facts, it was an inference that should have been left for the jury to make or reject. See 3 Am. Jur. 2d *Agency* § 352 (2002); see also *St. Ann's Home for the Aged v. Daniels*, 95 Ill. App. 3d 576, 579, 420 N.E.2d 478, 481 (1981) ("Unless the parties' relationship is so clear as to be undisputed, the existence and scope of an agency relationship are questions of fact, to be decided by the trier of fact").

■ Knauerhaze alternatively argues that if we find that no proof of agency was presented at trial, we should remand pursuant to our power under Supreme Court Rule 366 (155 Ill. 2d R. 366) to the trial court for the purpose of taking more evidence. Knauerhaze points out that in response to defendants' motion for directed verdict, he alternatively asked for leave to reopen the case and have the defendants' original answer read to the jury. The trial court, however, denied defendants' motion, finding that agency was established by the Rule 237 response and that it was unnecessary to reopen the case for more evidence.

Supreme Court Rule 366(a) enumerates the powers of the reviewing courts, which they may exercise in their discretion, including the powers to

"(1) exercise all or any of the powers of amendment of the trial court;

\*\*\*

(3) order or permit the record to be amended by correcting errors or by adding matters that should have been included;

(4) draw inferences of fact; and

(5) enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief, including a remandment, a partial reversal, the order of a partial new trial, the entry of a remittitur, or the enforcement of a judgment, that the case may require." 155 Ill. 2d R. 366(a).

In support of his argument to remand, Knauerhaze cites to *Inter-Insurance Exchange of the Chicago Motor Club v. Employers Mutual Casualty Co.*, 31 Ill. App. 3d 906, 334 N.E.2d 913 (1975). In that case, the trial court entered declaratory judgment for the plaintiff insurer against the defendant insurer based solely on the pleadings and arguments of counsel. *Inter-Insurance Exchange of the Chicago Motor Club*, 31 Ill. App. 3d at 907, 334 N.E.2d at 916. The court determined

that the defendant's policy afforded coverage for the incident and was the primary policy. *Inter-Insurance Exchange of the Chicago Motor Club*, 31 Ill. App. 3d at 907, 334 N.E.2d at 914. The appellate court affirmed that conclusion but could not conclude from the record whether "escape" clauses in either of the policies rendered defendant's coverage secondary. *Inter-Insurance Exchange of the Chicago Motor Club*, 31 Ill. App. 3d at 909, 334 N.E.2d at 915. Therefore, the court remanded to the trial court for the "limited purpose of receiving evidence of the 'excess' coverage provision of plaintiff's policy and the 'escape' provision, if any, in defendant's policy, and determining which provision prevails." *Inter-Insurance Exchange of the Chicago Motor Club*, 31 Ill. App. 3d at 909, 334 N.E.2d at 915.

Knauerhaze contends that the instant case is like *Inter-Insurance Exchange of the Chicago Motor Club* in that remanding for further evidence does not amount to giving him a second day in court because, as the court in that case stated, "the concept of 'a day in court' is not to shut the parties off, but on the contrary to permit the parties to offer all relevant evidence which the court requires to reach an accurate decision and to do justice." *Inter-Insurance Exchange of the Chicago Motor Club*, 31 Ill. App. 3d at 909-10, 334 N.E.2d at 915.

However, based on the circumstances of this case, we do not deem it appropriate to exercise our discretionary power under Supreme Court Rule 366 to remand this case so that Knauerhaze can prove agency. In *Geaslen v. Berkson, Gorov & Levin, Ltd.*, 155 Ill. 2d 223, 230, 613 N.E.2d 702, 705 (1993), the supreme court remanded a case pursuant to Rule 366 so that the plaintiffs could amend their complaint to sufficiently allege a breach of duty. The court noted that the dismissal of plaintiffs' complaint by the trial court, and the affirmance of that dismissal by the appellate court, denied plaintiffs any meaningful opportunity to either defend or amend their complaint. The court then noted that plaintiffs were not on notice that the sufficiency of their complaint would be attacked because neither defendants' motion to dismiss nor the trial court proceedings addressed plaintiffs' allegations. *Geaslen*, 155 Ill. 2d at 230-31, 613 N.E.2d at 705.

In contrast, in the instant case, Knauerhaze was clearly put on notice that agency was being put back in issue by defendants' answer to his amended complaint. Although that answer did not deny the existence of an agency relationship, it refused to answer the allegation because it called for a legal conclusion. Thus, the answer clearly notified Knauerhaze that defendants were not going to concede the agency issue and that Knauerhaze would have to prove it. Moreover, unlike in *Geaslen*, Knauerhaze did have a "meaningful opportunity" to address

the deficiency of his case because he had notice of the issue and the opportunity to proffer the defendants' original answer, which admitted agency, as an evidentiary admission at trial. Thus, contrary to Knauerhaze's contentions and reliance on *Inter-Insurance Exchange of the Chicago Motor Club*, a remand would, in fact, amount to a second day in court. Moreover, we note that in contrast to *Inter-Insurance Exchange of the Chicago Motor Club*, a remand in the instant case would theoretically require the cumbersome process of reconvening a jury. For these reasons, we decline to remand pursuant to our Rule 366 discretionary power so that Knauerhaze can offer proof of agency.

■ Knauerhaze finally contends that defendants forfeited their right to appeal the agency issue by failing to submit agency jury instructions or failing to object to the lack of jury instructions. In support of this contention, Knauerhaze cites *Ozik v. Gramins*, 345 Ill. App. 3d 502, 799 N.E.2d 871 (2003). In *Ozik*, the court stated:

"[A] litigant waives the right to object later, on appeal, to instructions or verdict forms that were given to a jury, when the party fails to make a specific objection during the jury instruction conference or when the form is read to the jury. [Citations.] Additionally, even if the litigant properly objects to an instruction or verdict form, the litigant is still required to submit a remedial instruction or verdict form to the trial court." *Ozik*, 345 Ill. App. 3d at 520, 799 N.E.2d at 885.

However, *Ozik* does not apply to the present situation because defendants do not object on appeal to jury instructions or verdict forms; rather, they contend that Knauerhaze failed to prove an agency relationship through which Allen Corporation can be held vicariously liable for Dr. Allen's negligence. See *Ozik*, 345 Ill. App. 3d 502, 799 N.E.2d 871. Moreover, *Ozik* does not address whether failing to object to the *lack* of instructions results in the issue being forfeited. See *Ozik*, 345 Ill. App. 3d 502, 799 N.E.2d 871. However, to the extent that *Ozik* is applicable, defendants did, in fact, submit an alternate verdict form which was rejected by the trial court. Defendants' proposed verdict form allowed the jury to find only against Dr. Allen and did not mention Allen Corporation at all.

Defendants contend that their motion for judgment notwithstanding the verdict or, alternatively, their motion for a new trial preserved the agency issue for appeal. A motion for judgment notwithstanding the verdict preserves for appeal the question "as to whether, in consideration of all the evidence presented, there [was] any evidence which tends to support the verdict," and a motion for a new trial may preserve "matters concerning the trial's outcome where specifically raised in the motion." *Forrester v. Patrick*, 167 Ill. App. 3d 105, 110,

520 N.E.2d 1188, 1191 (1988); *Zirp-Burnham, LLC v. E. Terrell Associates, Inc.*, 356 Ill. App. 3d 590, 599, 826 N.E.2d 430, 438 (2005). Thus, because defendants made both motions on the basis that Knauerhaze failed to provide any proof of agency, the issue was preserved to the extent applicable to both motions. Thus, defendants adequately preserved their right to appeal the agency issue. For the foregoing reasons, we reverse the trial court's denial of defendants' motion for judgment notwithstanding the verdict or, alternatively, for new trial on the issue of agency.

### III. ANALYSIS OF CROSS-APPEAL

Knauerhaze cross-appeals the trial court's interpretation and subsequent enforcement of section 2—1008(b) with respect to Oliver Nelson, special representative of Dr. Allen, and Northern Trust, substitute special representative of Dr. Allen. In this regard, Knauerhaze argues that the language in section 2—1008(b) that limits the amount of recovery under the section to the proceeds of any liability insurance does not prohibit him from making a subsequent claim against the decedent's probate estate for the remainder of his judgment. See 735 ILCS 5/2—1008(b) (West 2004). He next contends that the Probate Act, and not section 2—1008, which is part of the Code of Civil Procedure, governs his claim against Dr. Allen's estate. Knauerhaze finally contends that an interpretation of section 2—1008 that prohibits his ability to pursue his claim against the probate estate amounts to an unconstitutional legislative remittitur.

Section 2—1008(b) provides:

"(b) Death. If a party to an action dies and the action is one which survives, the proper party or parties may be substituted by order of court upon motion as follows:
\*\*\*

(2) If a person against whom an action has been brought dies, and the cause of action survives and is not otherwise barred, his or her personal representative shall be substituted as a party. If no petition has been filed for letters of office for the deceased's estate, the court, upon the motion of a person bringing an action and after the notice to the party's heirs or legatees as the court directs and without opening an estate, may appoint a special representative for the deceased party for the purposes of defending the action. If a party elects to have a special representative appointed under this paragraph (2), the recovery shall be limited to the proceeds of any liability insurance protecting the estate and shall not bar the estate from enforcing any claims that might have been available to it as counterclaims." 735 ILCS 5/2—1008(b) (West 2004).

Statutory interpretation presents a question of law that we review

*de novo. Quad Cities Open, Inc. v. City of Silvis,* 208 Ill. 2d 498, 508, 804 N.E.2d 499, 508 (2004). "The primary rule of statutory interpretation, to which all other rules are subordinate, is that a court should ascertain and give effect to the intent of the legislature." *Bonaguro v. County Officers Electoral Board,* 158 Ill. 2d 391, 397, 634 N.E.2d 712, 714 (1994). A statute should be read as a whole and each provision should be construed in connection with every other section. *Bonaguro,* 158 Ill. 2d at 397, 634 N.E.2d at 714. In ascertaining legislative intent, reviewing courts should look primarily to the language used in the statute. *Bonaguro,* 158 Ill. 2d at 397, 634 N.E.2d at 714. "If legislative intent can be ascertained from the statute's plain language, that intent must prevail without resort to other interpretive aids." *Balmoral Racing Club, Inc. v. Topinka,* 334 Ill. App. 3d 454, 459, 778 N.E.2d 239, 243 (2002). Courts will avoid a construction of a statute which renders any portion of it meaningless or void (*People v. Tarlton,* 91 Ill. 2d 1, 5, 434 N.E.2d 1110, 1111 (1982)) and will avoid any construction which would raise doubts as to the statute's constitutionality (*Morton Grove Park District v. American National Bank & Trust Co.,* 78 Ill. 2d 353, 363, 399 N.E.2d 1295, 1299 (1980)).

We note at the outset of our interpretation of section 2—1008(b) that the parties have not brought any case to our attention, nor, for that matter, have we have found any case, that has specifically dealt with the effect of the limitation in section 2—1008(b) to liability insurance on subsequent claims against the decedent's estate. Thus, the issue is one of first impression for this court. Looking solely to the plain language of this section (*Balmoral Racing Club,* 334 Ill. App. 3d at 459, 778 N.E.2d at 243), the legislative intent seems clear. The section states that "[i]f a party elects to have a special representative appointed \*\*\*, the recovery shall be limited to the proceeds of [the] liability insurance." 735 ILCS 5/2—1008(b) (West 2004). The phrase "shall be limited," given a plain reading, appears plain in its meaning that further recovery cannot be acquired after recovering the amount available from liability insurance. The section does not say that recovery shall be limited only to the extent that the section is relied upon and that a litigant can seek additional recovery on the same judgment elsewhere. See 735 ILCS 5/2—1008(b) (West 2004). We presume that if the legislature had intended to qualify the limitation of this section in such respects it simply would have put in language making such qualifications. See *Unzicker v. Kraft Food Ingredients Corp.,* 203 Ill. 2d 64, 77-78, 783 N.E.2d 1024, 1033 (2002).

Furthermore, this plain reading of section 2—1008(b) complies with the apparent purpose of limiting the amount recoverable under this section. Section 2—1008(b) allows a plaintiff to proceed with his

claim against a defendant who dies after the suit is filed without requiring that a probate estate be opened and consequently without invoking the protection and supervision of the probate court and Probate Act. 735 ILCS 5/2—1008(b) (West 2004). However, correspondingly, in allowing a plaintiff to proceed against a special representative, section 2—1008(b) limits the amount recoverable to the amount of liability insurance protecting the estate so as not to allow, under those circumstances, the financial depletion of the estate itself. 735 ILCS 5/2—1008(b) (West 2004). It is axiomatic that a plaintiff should not be able to collect a judgment without such protection and supervision under the special representative provision of section 2—1008(b) and then pursue that judgment against the entire estate by attempting to substitute the estate after the judgment was rendered. *Cf. Hannah v. Gilbert*, 207 Ill. App. 3d 87, 90, 565 N.E.2d 295, 297-98 (1990); see generally 16C C.J.S. *Constitutional Law* § 946 (1985).

The special representative provided for under section 2—1008 is not the same as the administrator of a probate estate. *Hannah*, 207 Ill. App. 3d at 90, 565 N.E.2d at 297-98 ("a special administrator appointed pursuant to [section 2—1008(b) of] the Civil Practice Law for the purposes of defending an action is not the equivalent of an administrator appointed pursuant to the Probate Act").

> "The appointment of a special administrator does not trigger the issuance of letters of office or empower anyone to distribute the assets of the decedent's estate in order to satisfy a judgment against the decedent. When a special administrator is appointed for the purpose of defending an action against the decedent, her statutory power is limited to defense of the action" *Hannah*, 207 Ill. App. 3d at 90, 565 N.E.2d at 297-98.

Knauerhaze further contends that reading subsections 2—1008(b) and 2—1008(a) in conjunction supports his proposition.

Subsection 2—1008(a) states:

> "(a) Change of interest or liability. If by reason of marriage, bankruptcy, assignment, or any other event occurring after the commencement of a cause or proceeding, either before or after judgment, causing a change or transmission of interest or liability, or by reason of any person interested coming into existence after commencement of the action, it becomes necessary or desirable that any person not already a party be before the court, or that any person already a party be made party in another capacity, the action does not abate, but on motion an order may be entered that the proper parties be substituted or added, and that the cause or proceeding be carried on with the remaining parties and new parties, with or without a change in the title of the cause." 735 ILCS 5/2—1008(a) (West 2004).

Knauerhaze emphasizes that subsection 2—1008(a) allows persons to be substituted where "any other event" results in a change of interest and it becomes "necessary or desirable" that the substitution take place, and that substitutions can be made "either before or after judgment." Knauerhaze contends that the opening of Dr. Allen's probate estate was an event that resulted in a change in interest or liability and permitted for the substitution of Dr. Allen's estate for the special representative Oliver Nelson.

However, there is nothing in subsection 2—1008(a) that restores liability under subsection 2—1008(b) beyond the liability insurance simply because of a substitution, and the rationale for limiting recovery still applies. In that regard, we would further emphasize that a strict limitation to liability insurance as set forth in subsection 2—1008(b) has to prevail over the general substitution language of subsection 2—1008(a). Specific statutory language will take precedence over more general language relating to the same topic. *Flynn v. Industrial Comm'n*, 211 Ill. 2d 546, 555, 813 N.E.2d 119, 125 (2004).

The fact that Knauerhaze had Northern Trust, the administrator of Dr. Allen's newly opened probate estate, substituted for Oliver Nelson as special representative does not change the fact that Dr. Allen's estate had no opportunity to defend its interests during the trial. Thus, it follows that the mere fact of substituting Northern Trust did not, as Knauerhaze would contend, circumvent subsection 2—1008(b)'s limitation on recovery to liability insurance. As noted by the trial court, the substitution of Northern Trust for Oliver Nelson was a non-substantive housekeeping matter that did not change the effect of subsection 2—1008(b)'s limitation to liability insurance. Knauerhaze did not object to this characterization of the substitution. Knauerhaze chose to invoke subsection 2—1008(b) and avoid the additional time and effort involved with opening a probate estate before trial; in so doing, he accepted the limitations of subsection 2—1008(b) and waived his right to later proceed against the very estate he opted to not include in the trial.

Knauerhaze finally contends that limiting his recovery against Dr. Allen to the liability insurance proceeds pursuant to section 2—1008(b) constitutes an unconstitutional legislative remittitur. With regard to this argument, we first note that there is a "strong presumption that legislative enactments are constitutional [citation] and one who asserts otherwise has the burden of clearly establishing the constitutional violation." *Bernier v. Burris*, 113 Ill. 2d 219, 227, 497 N.E.2d 763, 767 (1986).

In support of his contention, Knauerhaze cites *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 689 N.E.2d 1057 (1997), in which the

supreme court held that the compensatory damages cap of section 2—1115.1 (735 ILCS 5/2—1115.1 (West 2004)) violated the separation of powers clause of the Illinois Constitution by reducing damages by law without regard to the specific circumstances of individual jury awards. Knauerhaze argues that a reading of section 2—1008(b) that prohibits additional recovery from a decedent's probate estate is essentially the same thing as the cap on damages of section 2—1115.1 that the supreme court found unconstitutional.

However, there are distinct differences between sections 2—1008 and 2—1115.1. Section 2—1115.1 applied to all causes of action based on negligence or products liability for noneconomic damages and limited the amount of recovery to $500,000. 735 ILCS 5/2—1115.1 (West 2004). Thus, section 2—1115.1 was automatically applicable to statutorily limit recovery for certain actions. 735 ILCS 5/2—1115.1 (West 2004). In contrast, section 2—1008(b) will only act to limit a litigant's recovery when invoked by that party. 735 ILCS 5/2—1008(b)(2) (West 2004). Knauerhaze had the option to open a probate estate during the pendency of litigation. Instead, he chose to invoke section 2—1008(b) to avoid the formalities inherent with probate; however, in making this choice, Knauerhaze implicitly agreed to the limits of the statute he invoked.

Moreover, *Best* distinguished between causes of action based in common law and those legislatively created and noted that, with regard to the latter, the legislature could constitutionally limit damages because it had created both the right and the remedy. *Best*, 179 Ill. 2d at 397 n.3, 689 N.E.2d at 1072 n.3, citing *Hall v. Gillins*, 13 Ill. 2d 26, 29 147 N.E.2d 352, 354 (1958); *Cunningham v. Brown*, 22 Ill. 2d 23, 174 N.E.2d 153 (1961). Although Knauerhaze's cause of action started out as a simple negligence action, which is clearly a common law cause of action, at common law that cause would have abated once Dr. Allen died. However, Knauerhaze's cause of action did not abate because the legislature provided for the survival of actions. 735 ILCS 5/2—1008 (West 2004). In providing for the survival of an action, there was nothing to prevent the legislature from imposing conditions to protect estates in the event the Probate Act is bypassed and replaced by section 2—1008(b). Thus, based on *Best*, even if the limitation of section 2—1008(b) were not applicable only at a party's invocation, the limitation on recovery would arguably still be constitutional. We therefore find that Knauerhaze has failed to meet his burden of "clearly establishing [a] constitutional violation." *Bernier*, 113 Ill. 2d at 227, 497 N.E.2d at 767.

## IV. CONCLUSION

For the foregoing reasons, we affirm the trial court's denial of

defendants' motions for judgment notwithstanding the verdict and new trial on the issue of negligence; we reverse the trial court's denial of defendants' motions on the issue of agency; and we affirm the trial court on the application of section 2—1008.

Affirmed in part; reversed in part.

McBRIDE and O'MALLEY, JJ., concur.